A-PDF Merger DEMO : Purchase from www.A-PDF.com to remove the watermark



# HOLYOKE POLICE DEPARTMENT

## STANDARD OPERATING PROCEDURES

| SUBJECT: USE OF FORCE AND USE OF FORCE REPORTING | USE OF FORCE POLICY | |
|---|---|---|
| REFERENCE NUMBERS:<br><br>8.2.0  and  8.2.1 | EFFECTIVE DATE:<br>July 15, 2012 | REVISION DATE:<br>June 26, 2012 |

I.       **GENERAL CONSIDERATIONS AND GUIDELINES**

Because of their law enforcement and peacekeeping role, police officers will be required at times to resort to the use of physical force to enable them to fully carry out their responsibilities.  Police officers are confronted continually with situations requiring or resulting in the use of various degrees of force to affect a lawful arrest, to ensure public safety, or to protect themselves or others from harm.  The degree of force used is dependent upon the facts surrounding the situation the officers face.  Only a reasonable and necessary amount of force may be used.  The degree of force the officer uses often depends upon the amount of resistance or threat to safety that the situation produces.

The objective of the use of force is to maintain and/or reestablish control over a situation.  Control is reached when a person complies with an officer's directions and/or the suspect is restrained or apprehended and no longer presents a threat to the officer or others.  Since officers will encounter a wide range of behaviors, they must be prepared to utilize a range of force options that are reasonable and necessary to maintain and/or reestablish control by overcoming resistance to the officers' lawful authority while minimizing injuries.

Because there are an unlimited number of possibilities, allowing for a wide variety of circumstances, no written policy can offer definitive answers to every situation in which the use of force might be appropriate.  Rather, this policy will set certain specific guidelines and provide officers with a concrete basis on which to utilize sound judgment in making reasonable and prudent decisions.

I.       **POLICY**

It is the policy of the department that:

A.      Officers use only the force that is reasonably necessary to make a lawful arrest, to place a person into protective custody, to effectively bring an incident under control, or to protect the property, lives, or safety of the officer and others.

## II.   DEFINITIONS

A.   *Less Lethal:* Any use of force other than that which is considered deadly force.  This includes any physical effort used to control or restrain another, or to overcome the resistance of another.

Use of less lethal force as outlined in this directive means use of hands, handcuffs or other restraining devices, chemical substances or instruments for the emission of gas, police batons, TASER, impact munitions or other weapons of opportunity.

B.   *Deadly Force:* Any use of force that is reasonably intended or likely to cause death or serious bodily harm.

## III.   PROCEDURES

### A.   Use of Deadly Force and Guidelines

1.   Police officers are issued firearms and trained in their use for self-protection and for the protection of the public. The use of a firearm is the highest degree of force a police officer may apply and a decision to use a firearm in the performance of his/her duties is the most critical judgment a police officer is called upon to make.

2.   A police officer is authorized to use deadly force whenever it is reasonable and necessary to combat deadly force, used or threatened, if there is imminent danger of death or serious bodily injury to the officer himself/herself or to any other person unlawfully attacked.

3.   The use of firearms to affect the arrest of a known felon or to prevent the escape of a fleeing felon should be restricted to those offenses where deadly force has been used or threatened and where the police officer has reasonable cause to believe that death or serious bodily injury could result unless the felon is immediately apprehended.

4.   No set of guidelines for the use of firearms can possibly cover every situation that might arise and every police officer is expected to respond to all such emergencies decisively with the highest level of good judgment and professional competence.

**B.    Less Lethal Force Procedures**

1.    Where deadly force is not an option, officers may use only that level of force that is reasonably necessary to bring an incident under control.

2.    Less lethal force may be used by a police officer in the performance of his/her duty.

   a.    When necessary to preserve the peace, prevent commission of offenses or prevent suicide or self-inflicted injury, or

   b.    When necessary to overcome resistance to lawful arrest, searches and seizures, and to prevent escape from custody, or

   c.    When in self-defense, or defense of another against unlawful attack to his/her person or property.

3.    The force used shall be no greater than is necessary and reasonable in a given situation. The amount or degree of force, which may be employed, will be determined by the perceived circumstances including but not limited to:

   a.    The nature of the offense,

   b.    The behavior of the subject against whom force is being used,

   c.    Actions by third parties who may be present, and

   d.    Physical odds against the officer

4.    The officer's response options within each of the five force levels identified in the MPTC Use of Force Reference Guide (See Attached) are not necessarily listed in the order of use or need. The officer may de-escalate, stabilize or escalate his/her response based upon his/her risk assessment and the perceptions of the subject's degree of compliance or non-compliance. The Department recognizes that there are other methods and tactics that can be used at each level of force. If a tactic or weapon of opportunity is used that is not listed, the use must be objectively reasonable as it related to the officers risk assessment and the subjects actions.

5.    A WEAPON SHALL NOT BE DISPLAYED OR BRANDISHED as a threat unless it's actual use in the situation would be proper.  This does not prohibit an officer from having a weapon readied when it is anticipated that a weapon may be required.

6.    Officers shall be properly trained in the use of all weapons such as batons, OC, TASER, or impact munitions before being authorized to carry such.

C. **Oleoresin Capsicum Procedures**

1. It is the policy of the Holyoke Police Department that Oleoresin Capsicum is to be used in accordance with MPTC Training. Oleoresin Capsicum (OC) may be used when physical force is necessary.

   a. To protect an officer or third party from actively resisting arrest.

   b. To subdue a person

   c. When it is obvious that physical confrontation will occur with a person about to be placed into custody.

   d. To prevent persons from inflicting harm upon themselves

   e. To deter persons engaged in riotous conduct or barricaded subjects.

2. Use Guidelines

   a. Oleoresin Capsicum should be used at a distance of a minimum of 4' to 6' from the aggressor. It should not be used at such close distance that the force of the discharge (propellant) might reasonably cause injury to the eyes unless exigent circumstances exist.

   b. The use of Oleoresin Capsicum should be avoided if possible against persons the officer reasonably believes to be very young, infirm, elderly, handicapped, or pregnant, unless exigent circumstances exist. Those circumstances are to be detailed in the Holyoke Police Department Use of Force Form.

   c. Oleoresin Capsicum should not to be used under circumstances that will create an unreasonable risk to the subject being sprayed or other officers, unless exigent circumstances exist. Such circumstances will be detailed in the Use of Force Form (i.e. at the top of a stairwell, in front of an open flame, while operating a moving motor vehicle.)

   d. Whenever a subject who has been sprayed insists on medical attention while in custody, an EMS unit is to be summoned to examine/treat him/her.

   e. Officers should closely monitor the medical condition of all persons who have significantly struggled or tried to run, beginning at the time of handcuffing and continuing through the time the prisoner is in custody or is released. This means constant attention to the breathing and consciousness of the prisoner. If significant difficulty in breathing develops, or the prisoner appears to lose consciousness, take prisoner to the hospital or transport by ambulance. This is true for all prisoners, not just those who have been sprayed with Oleoresin Capsicum or other irritant.

f.  Prisoners in the HPD Lock Up normally should not to be sprayed with Oleoresin Capsicum to prevent cell block contamination unless exigent circumstances exist. The Officer-in-Charge will document to the Captain of Operations detailing the circumstances that led to the OC use.  This report will be done prior to the end of the tour of duty.

g.  Use of Force Form: This form will be completed every time OC is used by the Officer deploying the OC.

h.  The Use of Force Form will be submitted to the Officer-in-Charge who in turn will submit said form to the Captain of Operations.

## D.    TASER Use Procedures

1.  The TASER is a less lethal conducted energy weapon that uses nitrogen propelled probes to conduct energy at 26 watts and 50,000 volts to temporarily immobilize, thereby controlling and overriding the central nervous system. The nervous system communicates by means of simple electrical impulses. The TASER sends out short duration, high voltage electrical waves that overpower the normal electrical signal within the nerve fibers. EMD (Electro-muscular Disruption) overrides the central nervous system and takes direct control of the skeletal muscles. The TASER is an EMD system and affects the sensory and motor nervous system with signals. However, these systems go one step further by directly causing the muscles to contract. Hence even someone whose sensory nervous system is impaired by drugs and or alcohol will have involuntary muscle contractions.

2.  Policy

a.  The full probe deployment will be placed at the Assaultive/Bodily Harm Level of the Holyoke Police Department Use of Force Model. The TASER may be used in the DRIVE STUN MODE when the subject's actions constitute *Active Resistance.*

3.  Usage Procedures

a.  The TASER will be used as an additional police tool and is not intended to replace firearms or other self defense techniques. The TASER may reduce the need for other types of physical force by an officer.

b.  Records for each TASER will be kept, documenting every use, including training and actual use of force deployment in the field.

c.  All field TASER deployments will be documented on Holyoke Police Department Use of Force Reports and maintained as per state law guidelines.

d.  When the TASER is deployed, the Officer should bring the subject under control before removing the probes.  Trained First Responders shall remove the probes from the subject utilizing universal precautions unless the probes are embedded in a sensitive area such as the eye, female breast, face, neck, or groin.  If embedded in a sensitive area, officers shall have medical personnel remove the probe(s). If medical personnel feel a physician should remove the probe(s), then the subject

should be transported to the hospital for the probe removal. The removed probes should be treated as a bio hazard.

e.      The Use of Force Form will be filled out by the officer deploying the TASER.

f.      The TASER by legislative mandate requires special reporting requirements upon each agency utilizing the device. The Holyoke Police Department will submit reports to the Secretary of Public Safety in the manner and the time periods prescribed by that office and by M.G.L.  C.140, s13lj.

4.      Guidelines

a.      Only those officers designated by the shift supervisor or OIC and who have successfully completed the approved certified training will be authorized to use the TASER.

b.      To be certified in the use of the TASER, it is strongly advised that officers experience the effects of the device during training.

c.      Re-certification for end-users will occur annually. Re-certification for instructors will occur every two years and in the manner outlined by the Office of The Secretary of Public Safety and in accordance with the manufacturer's specifications.

d.      Officers trained in the use of the device will be issued the TASER at the beginning of the shift and return the same one to the department holding area upon completion of their tour of duty.

e.      Officers will carry the device in an approved holster issued by the department in a cross draw configuration.

f.      Officers will test each device issued to them in a manner detailed by their training at the start of their shift.

g.      All equipment failures or other problems associated with such device will be reported immediately to their shift supervisor and TASER Program Supervisor.

h.      The TASER Program Supervisor or designee shall inspect all TASERS to ensure that they are functional and operationally safe for use by authorized personnel prior to being placed in the holding area.

i.      Each TASER will be inspected on an annual basis to ensure it continues to be functional and operationally safe by the TASER Program Supervisor or designee.

j.       The TASER Program Supervisor or his/her designee shall conduct a maintenance download of each TASER at least once every 90 days.

k.      If a TASER malfunctions, it shall be removed from service and sent for repair.

l.      After a full TASER deployment (not drive stun), the weapon shall be secured in Commanding Officers office.  The data from the TASER will be downloaded within 48 hours by the TASER Program Supervisor or designee.  The downloaded data will be saved to a disc and entered into evidence; a printout of the data will be included as a supplement to the incident report.  Once the download is complete, the weapon may be returned into service.

m.      When a TASER is used, the Holyoke Police Department Use of Force Form must be completed by the Officer  deploying the TASER. Each application of the TASER shall be considered a separate instance of a Use of Force and shall be documented separately as such.

n.      At no time shall the TASER be used for the purpose of punishment or as an interrogation device.

o.      No Officer shall playfully, recklessly, maliciously or intentionally misuse the TASER.

5.    Considerations

a.      The TASER can be an ignition source and should not be deployed near flammable liquids and fumes or in highly flammable or oxygen-rich environments.  Some OC spray may contain isopropyl alcohol, which is flammable, and when used in conjunction with a TASER could ignite.

b.      Officers should avoid using a TASER on individuals who are positioned in a location where a significant fall could result in serious injury (ledge, balcony, bridge, rooftop, etc.).

c.      The TASER should not be used on handcuffed persons unless they are actively resisting, exhibiting active aggression, and/or to prevent individuals from harming themselves or others.

d.      The TASER should not be used against suspects in physical control of any vehicle in motion, unless exigent circumstances exist.

e.      The TASER should not be used against persons the officer reasonably believes are young children, pregnant females, elderly, visibly frail persons, subjects who are in water, unless clear circumstances exist which necessitates its use.

f.      The Officer should use discretion when deploying the TASER and be mindful of environmental factors.  Officers shall announce "TASER", except when doing so may jeopardize the health or safety of the officer(s).  The announcement shall provide other officers and the public with a warning that the TASER is about to be deployed.

6.      Training Procedures

    a.      All Officers authorized to carry a TASER will be trained using a curriculum identical to the MPTC's.

    b.      Training will be conducted by instructors certified by the manufacturer and the Massachusetts Police Training Council.

    c.      Training will be a minimum of eight (8) hours on the device for initial end users. There will be annual refresher training.

    d.      Each instructor will teach from an approved TASER manufacturer lesson plan for refresher training.

    e.      Training by certified instructors will include medical issues regarding the use of electronic weapons, including the effects or possible effects of the weapons on individuals with pre-existing medical and/or mental health conditions.

    f.      Training will be inclusive of effects of electronic weapons on the following Medical/mental health conditions:

        i.    Cardio Vascular Disease
        ii.   Pulmonary Disease
        iii.  Diabetes
        iv.   Alcoholism
        v.    Drug Addiction
        vi.   Compromised Immune Systems
        vii.  Mental Health Disease

    g      Training will also include information on and demonstration of the removal of probes from an individual after an electronic weapon has been discharged.

    h.      Each individual being trained will receive and be taught the Department Use of Force Policy and the Policy on the TASER and the Use of Force Reporting Policy during the training.

    i.      Each officer will be trained in the Use of Force Reporting requirement and forms.

    j.      Instructors will submit training approvals for all personnel that have successfully completed initial or refresher training and submit these forms to the employees' files.

**E.     The Baton Procedures**

1.     May be used by an officer;

    a.      As a defensive tool to block an attack

    b.      As an offensive weapon to deliver disabling strikes to non-vital areas of the body as a means to stop assaultive behavior towards Officers or others.

        i.     To overcome assaultive behavior of an arrestee;
        ii.    To overcome an assault on an officer or third party;
        iii.   To deter persons engaged in riotous or violent conduct

2.     When the use of the baton is necessary, these guidelines shall be followed:

    a.      Strikes to the head, temple or throat could result in serious injury or even death; strikes to the kidney areas can also be critical or fatal. These areas may only be targeted when Deadly Force is appropriate and the Officer cannot deploy their firearm. (Refer to the Monadnock Baton Striking Chart at the end of this section.)

3.     Following any incident involving the use of force, the officer using force shall file with his/her commanding officer a report containing the following information and complete the Departmental Use of Force Form.

    a.      The names and addresses of victims and witnesses.

    b.      The extent and treatment of injuries, if any.

    c.      The name of treatment facility and doctor administering treatment.

    d.      The reasons and circumstances that required the use of force.

4.     The report filed by an officer involving the use of force shall be in addition to any arrest report etc. and directed to the office of the Chief via the Commanding Officer prior to the expiration of his/her tour of duty except when the officer in incapacitated (i.e. being treated at a Hospital.)

5.     In accordance with MGLA, Chapter 276 section 33, the Commanding Officer shall, forthwith, file a written report and submit same to the office of the Chief-of-Police.

**F.     Impact Munitions Procedures**

1.     The use of Impact Munitions has become a popular tool in the Use of Force Model. The munitions offer increased engagement distances, providing greater standoff from physical contact. They have been used effectively as a compliance tool for crowd control routing during civil disturbances and more recently for the momentary incapacitation or disorientation of aggressive, lightly armed subjects. The ability to disorient or incapacitate an individual without engaging in physical contact inevitably ensures the

safety of the officer while providing an alternative to deadly force when officer or public safety is not compromised.

2. Policy
   *It is the policy of the department to;*

   a. Place the use of SIMS (Specialty Impact Munitions) at Level IV, Assaultive Bodily Harm of the Holyoke Police Department Use of Force Model.

   b. SIMS may be deployed whenever a situation arises when other Use of Force techniques may expose the officer(s), the subject(s), or the public to unnecessary danger, or when the other force techniques have been or may obviously be ineffective.

3. Impact munitions may be used:

   a. By trained personnel to deliver disabling blows to non-vital areas of the body as a means to halt or deter a subject when all lesser means of applying less lethal force have failed or obviously be futile. An officer is justified in using this type of force under the following circumstances:

      i.   To overcome assaultive behavior of an arrestee.

      ii.  To overcome and assault on an officer or third party.

      iii. To deter persons engaged in riotous or violent conduct.

      iv.  To deter persons from inflicting harm upon themselves.

4. Officers should only deploy impact munitions under the direction of the Officer in Charge, or his designee. However, under exigent circumstances where it is not possible to obtain OIC approval, impact munitions may be utilized providing all other written criteria have been met.

5. Announcement of Use of Impact Weapons

   a. Any time an impact munitions is used to strike a person, the projectile and shell casings shall be collected as evidence, the appropriate use of force reports shall be completed, and the proper medical attention rendered to the subject.

   b. Officers **should always have a lethal cover officer as a backup plan**, and the use of specialty impact munitions should never place an officer's safety in unnecessary jeopardy. For officer safety, the use of a ballistics shield/body bunker is highly recommended.

   c. The dedicated, orange-stocked Remington 870 launchers will be stored within the rifle boxes within Units 12 and 14, along with the DEF TEC .12 gauge stabilized bean bag rounds

d. The dedicated, orange-stocked Remington 870 launchers will remain unloaded, **WITHOUT EXCEPTION**, until situations arise requiring their use, at which time the trained operator(s) will identify the rounds as the specified DEF TEC .12 gauge stabilized bean bag rounds, and then load the launchers to capacity. This is to mitigate the chances of loading traditional lethal shotgun slug, buck shot, or bird shot ammunition.

e. Accordingly, when the deployment/need for deployment has ceased, the trained operator shall unload the launcher in a manner in which (s)he was trained and return the launcher and rounds to the rifle boxes of Units 12 and 14.

f. During those times that the weapon/launcher will be left unattended in the cruise, the officer, **WITHOUT EXCEPTION**, will make certain that his/her vehicle is locked and that the windows are up, so as to prevent unauthorized entry.

g. In the unforeseen circumstance that the weapon/launcher is lost or stolen, the officer will notify the Commanding Officer immediately. The Commanding Officer will in turn notify the Chief of Police. The officer will promptly submit a detailed report to the Commanding Officer on duty.

h. Sympathetic Fire: Whenever possible, the operator of the Direct Impact Munitions/SIMS launcher should ensure that all personnel on scene are aware that less-lethal tactics are involved and verbal notification shall be made by the operator prior to munitions being fired to avoid sympathetic fire from other officers.

6. Any time impact munitions are used the appropriate reports and Use of Force forms are to be completed by the officer using the munitions and submitted to the Shift Supervisor.

7. Medical attention will be provided as needed.

8. Training Procedures

a. Training will be conducted annually for users of Direct Impact Munitions.

b. Training will be conducted by departmental firearms instructors certified by the Massachusetts Police Training Committee.

c. Training will be a minimum of eight (8) hours on the munitions for initial users.

d. There will be annual refresher training.

e. Each departmental instructor will teach from an approved lesson plan with all necessary visual and safety aids.

f. Training by certified instructors will include medical issues, intended target areas (ITA'S), special considerations, including but not limited to: age, stature,

clothing, as well as the possible effects of deployment on individuals with pre-existing medical and/or mental health conditions.

**G.     Firearms Procedures**

1.     The following procedures shall be strictly adhered to concerning the use of firearms:

a.     An officer shall not discharge a firearm in the performance of duty, except under the  following circumstances and only after all other reasonable alternatives have been exhausted or where there is no substantial danger of his actions causing death or injury to the public:

b.     When it is absolutely necessary to defend himself/herself or another person from unlawful attack when (s)he has reasonable cause to believe that there is imminent danger of death or serious bodily harm or injury.

c.     To effect the arrest or prevent the escape of a dangerous convicted felon or a person who is committing or has committed a felony in which deadly force has been used or threatened and when he has reasonable cause to believe that the felon could cause death or serious bodily injury unless immediately apprehended.

i.     If the felony was not committed in the officer's presence, (s)he must have probable cause to believe that the felony has been committed and that the individual being pursued has committed it.

ii.     Firearms are not to be used to affect an arrest on <u>mere</u> suspicion that a crime has been committed or that a particular person has committed a crime.

iii.     Flight, in and of itself, is not necessarily evidence of the commission of a crime and is not sufficient reason for the use of firearms.

iv.     To kill a dangerous animal or an animal so badly injured that humanity requires that it be removed from further suffering.  In the case of an injured pet, the permission of the owner should be obtained whenever possible as well as the Shift Commander.  Great care should be taken to protect the public from a ricocheting bullet and if possible, the killing of an animal in the presence of children should be avoided.

v.     For authorized target practice or competition, with weapons issued or authorized by the department.

2.     The use of firearms **<u>ARE NOT AUTHORIZED</u>** in the following circumstances:

a.     As a warning shot;

b.     At or from a moving vehicle except to defend himself/herself when being fired upon or when the occupants of a vehicle being pursued have committed a felony in which deadly force was used and there is probable cause to believe that the

occupants are the actual offenders; that there is reasonable cause to believe that there is imminent danger of death or serious bodily injury; that their immediate apprehension is necessary for public safety and there are no other reasonable means available to prevent their escape and secure their arrest;

c.     In all cases, every precaution will be taken to ensure the safety of the public.

3.     Officer shall avoid the unnecessary display of firearms and not draw a firearm except when there is justification for its use to accomplish a proper police purpose.  In responding to any potentially dangerous situations, such as a robbery or a breaking and entering in progress, a police officer should carry his firearm in a position where it can be used speedily and effectively if necessary.

4.     Officers shall only carry firearms and ammunition issued or authorized by this department.  An officer shall not alter or modify his/her firearm or ammunition in any way without the express permission of the Chief of Police.

5.     An officer who injures any person through the discharge of his firearm will ensure that necessary steps are taken to provide the injured person with necessary medical treatment.

6.     Officers will be responsible for the safe handling of their firearms at all times and must properly secure their firearms when they are not under their direct control.

7.     Definition of terms:

a.     "Life Threatening Situation" – A situation or condition directed at a human life in which possible imminent death or severe injury would be the immediate result of the act.

b.     "Deadly Physical Force" – Physical force which under the circumstances used, is readily capable of causing death or other serious physical injury.

c.     "Probable Cause" – When, at that moment, the facts within the officers knowledge or of which he has reasonably trustworthy information sufficient to warrant a prudent person believing that the subject has committed or was committing an offense. This includes the Collective Knowledge Doctrine.

8.     The following procedure is to be followed whenever a firearm is discharged except during training or supervised target practice.

a.     Whenever a member discharges a firearm either:

i.     Accidentally;

ii.    In the performance of duty; or

iii.   Other than in the performance of duty, (s)he shall; notify his supervisor, commanding officer or bureau commander forthwith, and in no event later that the conclusion of his/her current tour of duty.  The supervisor or

commanding officer will immediately notify the platoon or bureau commander.

    b.    The platoon or bureau commander shall assign a superior officer with the rank of Sergeant or above to:

        i.    Investigate the incident and file a complete report to the Chief of Police;

        ii.    Impound the firearm if bodily injury has occurred. (If necessary take necessary steps to have a replacement firearm issued).

        iii.    Impound related articles, secure scene and have appropriate photographs taken when necessary.

    c.    For on duty officers, a report shall be submitted at the conclusion of the current tour of duty where practicable.

    d.    If a member discharges a firearm accidentally or in the performance of duty and is fatally injured or incapable of making out the report as required, the investigating officer will be responsible for filing as complete a report as possible within the injured officer's tour of duty.

    e.    At the completion of the investigation of the circumstances surrounding the discharge of a firearm, the investigating officer will submit a detailed report to his/her respective commanding officer.  In addition to the results of the investigation, the report will also contain the observations and conclusions of the commanding officer as to whether the discharge of the firearm was justified in accordance with these orders, or if disciplinary action is warranted.

9.    These procedures are intended to regulate the use of any and all police firearms including revolvers, pistols, rifles, automatic weapons, authorized off duty firearms or related equipment.

10.    The procedures outlined herein set forth the only circumstances under which a firearm can be used and it will be adhered to strictly by all members.

For non-departmental issued weapons, refer to SOP 6-1 currently in use.

## H. Medical Attention

1.    After any level of force is used, the officer shall immediately evaluate the need for medical attention or treatment for that person upon whom the force was used and arrange for such treatment when:

    a.    That person has a visible injury; or

    b.    In the case of use of pepper spray, immediately after spraying suspect, officers shall be alert to any indications that the individual needs medical care.  This

includes, but is not necessarily limited to, breathing difficulties, gagging, profuse sweating and loss of consciousness; or

c. That person complains of injury or discomfort and requests medical attention.

NOTE: Any person requesting and/or deemed in need of immediate medical attention shall be transported (in accordance with the departmental policy on *Transporting Prisoners* to the appropriate hospital or medical facility.  All medical treatment received shall be noted in the officer's report.

2. Injury to Prisoner

a. The officer shall promptly notify his/her immediate supervisor of the incident.

b. The officer shall attempt to locate and identify all witnesses, and obtain and document their statements.

c. The officer shall prepare and submit all required reports.  If more than one officer is involved in a use of force incident resulting in an injury, each officer shall complete a report outlining his/her actions and observations in the incident.

3. Patrol Supervisor

a. If available, the Patrol Supervisor shall immediately respond to the scene of any incident where, as the result of the application of physical force, an officer is injured, or a prisoner has a visible injury, or complains of injury or discomfort and requests medical attention, and

b. [S]he shall:

i. Ensure that officers receive any necessary assistance, including medical treatment, and that any injuries to officers are properly documented;

ii. Ensure that the need for medical treatment for the prisoner is properly evaluated and provided;

iii. Determine if a detective should respond to the scene and the level of investigative services to be utilized (including photos, measurements and diagrams).  If an injury or complaint of pain exists, supervisors are encouraged to obtain photographs; and

NOTE: A photograph showing no injury may be as important as one that shows injury.

iv. File a report on the incident and his/her observations with the officer-in-charge of the police station.

## I. Emergency Restraint Chair Procedures

1. Policy

a.    It is the policy of the Holyoke Police Department to take all reasonable measures to insure the safety and security of all persons in custody. The Department will also seek measures to minimize the risk to all staff members.

b.    When confronted with an out of control prisoner who may or may not be under the influence of Alcohol, Narcotics, or suffering from a mental illness, the Shift Supervisor may order the prisoner be placed into the Emergency Restraint Chair. The Emergency Restraint Chair is intended to help control combative, self destructive or potentially violent detainees, to prevent injury.

2.  Emergency Restraint Chair Guidelines

a.    Only the Shift Supervisor or his designee can order a prisoner into the Emergency Restraint Chair.

b.    The House Officer will make sure that enough officers are present in order to safely control the prisoner.

c.    The House Officer will make sure that the restraints are applied properly and securely. The House Officer will make sure circulation and breathing are not impaired in any way.

d.    The prisoner will be placed in a secure cell (with the door closed) in a position for the House Officer to make checks every 15 minutes as recommended.

e.    No prisoner may be held in the restraint chair for more than two hours from the time the prisoner was first placed in it. If, after two hours, the prisoner is still being violent or self destructive, medical attention is to be provided.

f.    The Emergency Restraint Chair will not be used as punishment for any reason. Simply being disruptive is not reason enough to warrant use of the Emergency Restraint Chair.

g.    The House Officer will submit an incident report documenting the use of the Emergency Restraint Chair. The report is to include the Shift Supervisor ordering the chair be used, names of all Officers assisting at the time the prisoner was secured, time of release, and whether medical attention was provided and, if so, by whom.

h.    The Departmental Use of Force Form will also be filled out by the House Officer and submitted via the Chain of Command.

**NOTES:**

# MPTC USE OF FORCE
# REFERENCE GUIDE



The **Totality Triangle ©** depicts the three elements which must be considered in determining whether an application of force was objectively reasonable.

**Perceived Circumstances -** the officer's perspective of the severity of any crime, the existence of an immediate safety threat to the officer or others, and the degree of compliance / non-compliance from the subject; culminating in its identification on the Use of Force Model.

**Perceived Subject Action (s)  -** the subject action (s) as perceived by the reasonable officer that designate the subject at one or more of the Use of Force Model's compliant / non-compliant categories.

**Reasonable Officer Response (s)  -** the "balanced" response (s) appropriate for the reasonable officer's selection from the Use of Force Model's identified response categories, in order to maintain or gain subject compliance and control.

## MPTC
## Use of Force Model



The Use of Force Model was developed in 1991 by Dr. Franklin Graves, Federal Law Enforcement Training Center and Professor Gregory J. Connor, University of Illinois Police Training Institute. ™ 1998, G. Connor. All rights reserved.

**Threat Perception Color Code -** the tactically applied and color adapted correlation of the Threat Perception Categories on the Use of Force Model.

**Control Superiority Principle © -** the understanding and visualization method utilized to reinforce the inherent principle of officer force  superiority over the subject's degree of compliance / non-compliance.

**Assessment / Selection Arrows -** the mechanism utilized to indicate the dynamic nature of an officer's decision-making process of Tactical Transition © during the enforcement encounter.

**Threat Perception Categories**

**Strategic  -** the broad "mind set" of the officer, represented by the blue baseline on the Threat Perception Color Code ©.  The contemporary officer must maintain this functional foundation, centered upon strategies designed to enhance the status of safety.

**Tactical -** the second level on the Use of Force Model, depicted by the color green.  Here the officer perceives an increase in threat potential within the confrontational environment and tactical procedures are designated and deployed.

**Volatile -** the third level on the Use of Force Model utilizing the color yellow to indicate an activated level of alertness and threat potential.  Here the officer is confronted with the presence or potential of critical dynamics, including threat intensity and severity within the enforcement encounter.

**Harmful -** at this level on the Use of Force Model the color orange denotes an accelerated perception of threat directed upon the officer or others.  In this regard the officer must deploy initial defensive force in the effort toward eventual subject compliance and control.

**Lethal -** the highest level on the Use of Force Model correlates to the most intense color in the Threat Perception Color Code ©, red.  Although this potentially lethal degree of threat is most infrequent, it remains most crucial for the continuation of officer safety and security.

**Perceived Subject Action (s) Categories**

**Compliant -** represents the vast majority of officer / citizen confrontations in the form of cooperation and control.  Such cooperation is generally established and maintained via cultural acceptance, verbalization skills, etc.

**Resistant (*Passive*) -** the preliminary level of citizen non-compliance.  Here, the citizen, although non-compliant, offers no physical or mechanical energy enhancement toward the resistant effort.

**Resistant (*Active*) -** the subject's non-compliance is increased in scope and / or intensity.  The subject's non-compliance now includes energy enhanced physical or mechanical defiance.

**Assaultive (*Bodily Harm*) -** the officer's attempt to gain lawful compliance has culminated in a perceived or actual attack on the officer or others.  The officer makes the reasonable assessment that such actions by the subject would not result in the officer's or other's death or serious bodily harm.

**Assaultive (*Serious Bodily Harm / Death*) -** the officer's attempt to gain lawful compliance has culminated in the perception of an attack or the potential for such attack on the officer or others.  The officer makes the reasonable assessment that such actions by the subject could result in serious bodily harm or death to the officer or others.

**Officer Response (s) Categories**

**Cooperative Controls -** include contemporary controls developed to preserve officer safety and security, including: communication skills, restraint applications, etc.

**Contact Controls -** includes resistant countermeasures designed to guide or direct the non-compliant subject.  These "hands on" tactics would include the elbow / wrist grasp, Hand Rotation Position ©, etc.

**Compliance Techniques -** includes resistant countermeasures designed to counter the subject's enhanced degree of resistance.  These tactics could include the Hand Rotation Technique ©, chemical irritants, TASER DRIVE STUN etc.

**Defensive Tactics -** includes assaultive countermeasures designed to cease the subject's non-lethal assault on the officer or others, regain control, and assure continued compliance.  These tactics could include baton strikes, kicking techniques, TASER DEPLOYMENT, impact munitions etc.

**Deadly Force -** includes assaultive countermeasures designed to cease an assault which is lethal or could cause great bodily harm on the officer or others.  These tactics could include the use of a firearm, lethal strikes, etc.

**© Copyright, 2000, G. Connor. All rights reserved.** For any questions relating to the Use of Force Model contact David Standen @ (413) 218 4510 or E-mail: DTIStanden@comcast.net

**NOTES:**

# MONADNOCK BATON CHART
## Escalation Of Trauma By Vital And Vulnerable Striking Areas



MT. MONADNOCK



Temple (1)
Ears (2)
Eyes (3)
Bridge of Nose (4)
Upper Jaw (5)
Lower Jaw (6)
Collarbone (8)
Throat (7)
Shoulder
Upper Abdomen
Solar Plexus (9)
Forearm
Rib Cage
Groin (11)
Lower Abdomen (10)
Thigh
Knee Joint (12)
Shin (13)
Instep (14)

Hollow behind Ear (16)
Back of Neck (15)
Upper Arm
Shoulder Blade (17)
Kidney (18)
Spine
Inside of Wrist (21)
Elbow Joint (22)
Back of Hand (23)
Tail Bone (Coccyx) (19)
Buttock
Calf
Achilles Tendon (20)

## S T R I K I N G

| GREEN TARGET AREAS | YELLOW TARGET AREAS | RED TARGET AREAS |
|---|---|---|
| **REASONING:** Minimal level of resultant trauma. Injury tends to be temporary rather than long-lasting, however exceptions can occur.<br><br>*Except for the HEAD, NECK, and SPINE, the whole body is a Green Target Area for the application of baton blocking and restraint skills.* | **REASONING:** Moderate to serious level of resultant trauma. Injury tends to be more long-lasting, but may also be temporary. | **REASONING:** Highest level of resultant trauma. Injury tends to range from serious to long-lasting rather than temporary and may include unconsciousness, serious bodily injury, shock or death. |

©1998 MONADNOCK POLICE TRAINING COUNCIL, INC. Fitzwilliam, New Hampshire USA

# Holyoke Police Department Use of Force Report

Date: ___/___/___   Time: _____   Arrest#: _____   Incident #: _____
Reporting Officer: _____   ID# _____
Suspects Name: _____   DOB: _____   SSN # _____

| Suspect Actions Category | Officers Response   (Check all that apply) |
|---|---|
| ☐ Resistant Active | ☐ Holds/Locks ☐ O.C. ☐ X26 Drive Stun ☐ Other * |
| ☐ Assaultive *(Bodily Harm)* | ☐ Strikes ☐ Baton ☐ X26 Taser ☐ Other * |
| ☐ Assaultive *(Serious Bodily Harm/Death)* | ☐ Baton    ☐ Firearm    ☐ Other * |

**\* Describe Weapon of Opportunity Here:**

_____
_____

Was Use of Force Effective? If **NO**, please explain: _____
☐ Yes ☐ No
Was the subject injured? If **YES**, please describe the injuries: _____
☐ Yes ☐ No
Was the subject given medical treatment? If **YES**, who administered the treatment? ☐ H.P.D. ☐ H.F.D ☐ AMR
☐ Yes ☐ No    What *hospital*, if any, was the subject transported to? ☐ HMC ☐ BMC
Was Restraint Chair used? ☐ Yes ☐ NO If YES, why? _____
Was X 26 used? ☐ Yes ☐ No ☐ Drive Stun ☐ Taser
☐ Baton ☐ Impact Munition ☐ O.C. Duration: _____ # of Bursts: _____   Was subject allowed to decon? ☐ Yes ☐ No



Front

Back

Supervisor Reviewing Use Comments:

_____
_____
_____

Supervisors Name *(print)*: _____   ID#: _____
            (Last)            (First)          (Middle)
Signature of Reviewing Supervisor: _____
☐ Approved ☐ Disapproved

*(Print)*: _____   ID#: _____
        (Last)          (First)          (Middle)
Signature of Bureau Commander: _____
    **\* This form is to be submitted to the Chief's Office immediately upon completion**