EXHIBIT 4

OFFICER CRYSTAL MANZI DEPOSTION PAGES 18, 20-25, 32-34, 36-37, 41, 51

Pages 1-76
Exhibits 1-4

---

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NO. 3:17-CV-30078

JOHN J. SMITH, JR.,
        Plaintiff,

v.

CITY OF HOLYOKE OFFICERS JAMES
PARNELL, CRYSTAL MANZI, SAMUEL
DELVALLE AND MSP TROOPER
THIAGO O. MIRANDA,
        Defendants.

---

DEPOSITION OF CRYSTAL MANZI
TAKEN NOVEMBER 15, 2018
AT THE LAW OFFICES OF
KOTFILA & JORDAN
ONE MONARCH PLACE, SUITE 1340
SPRINGFIELD, MASSACHUSETTS

Reporter:   Raymond F. Catuogno, Jr.

**18**

Q. As Mr. Smith walked by you and Officer Lopez, did he appear impaired at all to you?
A. No.
Q. Was he walking with any difficulty?
A. No.
Q. So once he gets into his car and reverses up Elm Street the wrong way, what do you do?
A. I got into my car, into the driver's seat, and then followed him to try to stop him for a traffic violation.
Q. Did Officer Lopez get into the cruiser with you?
A. No.
Q. Why not?
A. I don't know.
Q. Did you have any discussion with him about that?
A. Yes.
Q. What was that discussion?
A. He was calling out over the radio and he -- to dispatch to let them know. And he assumed Mr. Smith was going to stop, so he was

**19**

just going to walk up. He didn't expect all of that to happen.
Q. You testified that you had no prior conversation with Mr. Smith prior to him getting into the car?
A. Correct.
Q. As he walked towards his car, did you reach for your weapon at all?
A. Negative.
Q. Do you recall what kind of car Mr. Smith was driving?
A. It's an older car. I don't --
Q. Do you recall if it was a Volvo?
A. I don't know.
Q. Would referring to your report help refresh your recollection?
A. Yes.
Q. Could you do that for me, please? Let me see if I could refer to you the second paragraph.
A. Yes, a gray Volvo.
Q. So then after you get into your vehicle and begin to pursue Mr. Smith, what happens next?

**20**

A. He reverses to Suffolk Street and backs up and goes up Suffolk.
Q. What do you do?
A. I continued following him with lights and sirens, and then other units joined in.
Q. At this time were you having any contact on your radio with Officer Lopez as this was happening?
A. No.
Q. Are you having any contact on your radio with anybody as this is happening?
A. No.
Q. Officer Manzi, prior to Mr. Smith leaving Elm Street in his vehicle, neither you or Officer Lopez attempted to stop him, did you?
A. No.
Q. And as far as you were concerned, he was free to leave at that time?
A. Yes.
Q. He had not disobeyed any directives from you or Officer Lopez at that time, had he?
A. No.
Q. And as he drove away up Elm Street,

**21**

did he peel out?
A. Not that I remember.
Q. Do you recall -- was he speeding at the time?
A. No.
Q. He was -- just the fact that he was in reverse going the wrong way on a one-way street, that led you to pursue him?
A. Yes.
Q. Officer Manzi, do you recall were there any pedestrians on Elm Street at the time Smith drove up Elm Street?
A. I don't know.
Q. What was your intention once you began to pursue Mr. Smith that day?
A. To speak to him, possibly give him a traffic citation.
Q. What is the citation or the fine or penalty for driving the wrong way on a one-way street?
A. I'm not sure what the fine amount is.
Q. So once you begin to pursue Mr. Smith down Suffolk Street, do you recall

Page 22

1   what happens next?
2       A.   I don't.
3       Q.   Well, at some point it became a
4   high-speed pursuit?
5       A.   It was never high speed.
6       Q.   At some point it became a pursuit
7   with other officers involved?
8       A.   Yes.
9       Q.   Do you recall when that happened?
10      A.   Relatively soon. I want to say on
11  Suffolk Street.
12      Q.   Had you ever, Officer Manzi, been
13  involved in a pursuit prior to this one?
14      A.   No.
15      Q.   Have you been involved in any
16  pursuits since the pursuit with Mr. Smith?
17           MR. KITTREDGE: Objection.
18      A.   Yes.
19      Q.   And approximately how many times?
20      A.   Maybe five.
21      Q.   On June 25, 2014, were you familiar
22  with the Holyoke Police Department pursuit
23  policy?
24      A.   No.

Page 23

1       Q.   Had you had any training on the
2   pursuit policy?
3       A.   No.
4       Q.   That is not something that is
5   taught in the academy?
6            MR. EMMA: Objection.
7       A.   No.
8       Q.   Prior to this day, June 25, 2014,
9   had you ever seen any type of written manual on
10  the pursuit policy?
11      A.   No.
12      Q.   Do you know if there was one in
13  effect?
14      A.   I don't know.
15      Q.   At some point during the pursuit,
16  Officer Manzi, did Officer Parnell join you?
17      A.   He did.
18      Q.   Was Officer Parnell alone in his
19  vehicle or did he have another officer with him?
20      A.   I'm pretty sure he was alone.
21      Q.   At some point, Officer, does the
22  pursuit end up on Route 91?
23      A.   Yes.
24      Q.   Route 91 north?

Page 24

1       A.   Yes.
2       Q.   Prior to the pursuit ending up on
3   91 north, at any point did Officer Parnell
4   approach Mr. Smith's vehicle on foot?
5       A.   Yes.
6       Q.   Where did that happen?
7       A.   We were on Pleasant Street at the
8   intersection of Hampden at the lights.
9       Q.   And what happened when you were at
10  the intersection at that time?
11      A.   Mr. Smith stopped and Officer
12  Parnell got out of his vehicle to try to go over
13  and speak to him, and then Mr. Smith proceeded
14  and tried to swerve to hit Officer Parnell.
15           MR. EMMA: What intersection
16  is that again, please?
17           THE WITNESS: Pleasant and
18  Hampden.
19           MR. EMMA: Thank you.
20      Q.   (By Mr. Kotfila) And where was
21  your cruiser at the time?
22      A.   Right behind Officer Parnell's.
23      Q.   Pleasant Street, is that also known
24  as Northampton Street?

Page 25

1       A.   No.
2       Q.   So those are separate streets?
3       A.   Correct.
4       Q.   Did you note in your report,
5   Officer Manzi, the incident you just described
6   where you testified that Smith tried to hit
7   Officer Parnell with his vehicle?
8       A.   I did not.
9       Q.   And why didn't you put that in your
10  report?
11      A.   Because I was brand new. I forgot.
12  There was a lot going on.
13      Q.   Once the pursuit progresses onto
14  Route 91 north, were there other vehicles,
15  police vehicles, involved at that point?
16      A.   Yes.
17      Q.   Do you know approximately how many
18  there were?
19           MR. KITTREDGE: Objection.
20      A.   I will say maybe four or five. I'm
21  not sure.
22      Q.   Were you the lead officer?
23      A.   I was not.
24      Q.   Do you know who was?

Page 30

Departments?
A. I don't know.
Q. Was there communication on the radio as the pursuit was happening among the Holyoke police officers?
A. Yes.
Q. Do you recall what the communication was?
A. I think it was just the direction of the pursuit, his speed, maybe the weather conditions.
Q. And the Holyoke police officers were also in communication with the dispatch?
A. Correct.
Q. The Holyoke dispatch?
A. Yes.
Q. On that situation, Officer Manzi, what police agency was in charge of the pursuit?
A. I'm going to say Holyoke.
Q. Is that because it originated in Holyoke?
A. Yes.
Q. Do you recall some of the communications with the Holyoke police

Page 31

dispatch -- strike that.
Do you recall hearing, Officer Manzi, over the dispatch that Mr. Smith's vehicle tried to run over one of the Holyoke police officers?
A. I don't recall.
Q. Do you recall hearing over the dispatch if Mr. Smith's vehicle had tried to take out one of the Holyoke cruisers?
A. Yes.
Q. Do you know who called in that Smith's vehicle tried to take out one of the cruisers?
A. I don't know.
Q. Do you recall how many minutes the pursuit lasted?
A. I don't know.
Q. At any time during the pursuit did you consider discontinuing it?
A. No.
Q. Why not?
MR. KITTREDGE: Objection.
MR. JOYCE: Objection.
A. It was not my pursuit anymore to

Page 32

discontinue.
Q. Whose pursuit was it?
A. It usually goes to the street supervisor.
Q. The street supervisor?
A. Yes.
Q. Was there a street supervisor actively involved in the pursuit at that time?
A. There was a lot of supervisors.
Q. Do you know what supervisor was in charge of the operation?
A. I don't.
Q. And I know you testified before you were not familiar with the pursuit policy, so you would not know what the pursuit policy requires in terms of discontinuing a pursuit, do you?
A. I do not know.
Q. Once Mr. Smith's vehicle comes to a stop, what did you do next?
A. I walked over to the back of his vehicle and pretty much stood there while other officers were getting him out of the vehicle.
Q. And can you tell me what you

Page 33

remember observing in terms of the other officers getting him out of the vehicle?
A. State Trooper smashed his window.
Q. Do you remember officers physically removing Mr. Smith from the vehicle?
A. Yes.
Q. Were you involved in that?
A. No.
Q. What do you recall seeing?
A. They grabbed him out of the vehicle and put him on the ground away from the vehicle to handcuff him.
Q. Do you recall how many officers were involved in that action?
A. I'm not sure. Maybe four or five.
Q. Do you recall if any of the officers had their guns drawn at that point?
A. I don't know.
Q. Do you remember if there was a police dog involved in that operation?
A. I don't know.
Q. Once Smith is on the ground, what did you do?
A. I took out my Taser and took out

Springfield
413.732.1157
REAL TIME COURT REPORTING
schedule@realtimereporting.net
Worcester
508.767.1157
9

**Page 34**

1   the prongs to dry stun him because he would not
2   put his hands behind his back so we could
3   handcuff him.
4       Q.   What was Smith doing at that time?
5       A.   He was laying on his hands.
6       Q.   Were you speaking to Smith at that
7   time?
8       A.   Yes.
9       Q.   What were you telling him?
10      A.   To put his hands behind his back.
11      Q.   Was he speaking back to you at all?
12      A.   No.
13      Q.   Other than you, other than
14  yourself, Officer, were any of the other
15  officers or troopers giving Smith any commands
16  at that point?
17      A.   I don't know.
18      Q.   Now, you said at some point you
19  deployed your Taser?
20      A.   I took the prongs off to drive stun
21  him.
22      Q.   And could you describe to me -- in
23  terms of the Taser, there is two ways to
24  administer it?

**Page 35**

1       A.   Correct.
2       Q.   The Taser itself is when the
3   wires --
4       A.   The cartridge.
5       Q.   The cartridge goes into the
6   suspects?
7       A.   Yes.
8       Q.   And what do you mean by drive stun?
9       A.   If you take the cartridge off,
10  there is just two little sparks and you can use
11  that for pain compliance for someone who is
12  resisting and won't give their hands.
13      Q.   And you said you drive stunned
14  Mr. Smith?
15      A.   Yes.
16      Q.   Do you recall how many times?
17      A.   Well, he was moving, so I would put
18  it on him. And it would only work if it's
19  touching him and it automatically stops, but
20  it's only a five-second round. So when you put
21  it on and press the trigger, it is going to go
22  for five seconds even if it's not on a body.
23  But then you have to shut it off to put it back
24  on.

**Page 36**

1       Q.   You said it's for pain
2   manipulation, but what effect does the drive
3   stun have? What does it do?
4           MR. JOYCE: Objection.
5           MR. KITTREDGE: Objection.
6       A.   It hurts. So if someone is not
7   going to give you their hands, if they're laying
8   on their hands, and you put that on their back,
9   they're going to give you their hands usually
10  because it's pain.
11      Q.   And had you -- prior to drive
12  stunning, did you actually deploy the Taser on
13  him?
14      A.   No.
15      Q.   At any time during the incident,
16  did you deploy the Taser on him?
17      A.   No.
18      Q.   What happened when you drive
19  stunned him the first time?
20      A.   Nothing. He still was not giving
21  me his hands.
22      Q.   And what happened the second time
23  you drive stunned him?
24      A.   He still was not giving me his

**Page 37**

1   hands.
2       Q.   At some point did he give you his
3   hands?
4       A.   Yes.
5       Q.   When did that happen?
6       A.   Maybe after the third or fourth
7   time.
8       Q.   That you drive stunned him?
9       A.   Correct.
10      Q.   Do you recall how many times you
11  drive stunned him in whole?
12      A.   I don't know.
13      Q.   But you think it was at least four?
14      A.   I don't remember it being that
15  much, but they have to download it. And I think
16  that's what he said.
17      Q.   When you say that is what he said,
18  who do you mean?
19      A.   Officer Somers has to download it
20  to know what we did and how many seconds.
21      Q.   So the results from your Taser are
22  recorded?
23      A.   Correct.
24      Q.   And you recall the officer saying

## Page 38

you had drive stunned him three or four times?
A. Correct.
Q. Did you actually physically cuff Mr. Smith or did one of the other officers?
A. One of the other officers, I think.
Q. Other than drive stunning Mr. Smith, did you use any other force on him?
A. No.
Q. Did you observe any other officers Tasering Mr. Smith?
A. No.
Q. Did you observe any other officers drive stunning him?
A. No.
Q. Did you observe any other officers using any other force on Mr. Smith?
  MR. KITTREDGE: Objection.
A. I observed the trooper that was hitting Mr. Smith.
Q. In what area of the body was the trooper hitting Mr. Smith?
A. In his head.
Q. Do you recall what he was hitting him with?

## Page 39

A. His boot.
Q. He was kicking him?
A. Yes.
Q. How many times did that happen?
A. I only remember twice.
Q. Did you have any conversations with the trooper regarding why he was kicking Mr. Smith?
A. No.
Q. Did you hear the trooper saying anything to Mr. Smith as he was kicking him?
A. No.
Q. Officer Manzi, do you know if -- at the time of the incident with Mr. Smith, do you know if the Holyoke Police Department had a policy for a high-risk traffic stop?
  MR. EMMA: Objection.
A. I don't know.
Q. Are you familiar with that policy?
A. No.
Q. Prior to the officers engaging with Mr. Smith, did any of the officers attempt to order Mr. Smith out of his vehicle with a loudspeaker or microphone?

## Page 40

A. No.
Q. Do you know why that didn't happen?
  MR. EMMA: Objection.
A. I don't know.
Q. Was your cruiser equipped with a speaker?
A. Typically, yes.
Q. Is that typical for Holyoke Police Department cruisers?
A. Yes, but they don't always work.
Q. Do you know if your cruiser had a working speaker on that day?
A. I don't know.
Q. Officer Manzi, you're aware there was a video taken at least of part of the pursuit and arrest of Mr. Smith?
A. Yes.
Q. Have you seen that video?
A. I have.
Q. Do you recall when you last saw it?
A. A couple years ago.
Q. I'm going to show you a video and ask you if it's the one that you observed regarding Mr. Smith's arrest. What I'm going to

## Page 41

do Officer Manzi -- it's less than a minute. I'm going to let it play fully and then go back and ask you some questions.
A. Okay.
(Video played)
Q. (By Mr. Kotfila) Is that the video that you saw?
A. Yes.
Q. Does that video accurately portray the event as you remember it happening?
A. Yes.
Q. I'm going to go through and ask you some questions. I'm going to stop it at seven seconds. At this point, Officer, can you identify your cruiser in the video?
A. I believe mine is the one that is half in. I don't think it's up there yet.
Q. So you are at the bottom of the screen. You believe that is your cruiser?
A. Yes.
Q. And would you agree with me at this point in time Smith's tires had been flattened by the drop sticks?
A. Yes.

Page 50

Q. Do you see that?
A. Yes.
Q. But they are all by Supervisor Stewart?
A. Yes.
Q. Do you know why that was done four different times?
A. I have no idea.
Q. Might it be because there was a comment for each use of the drive stun?
    MR. KITTREDGE: Objection.
A. Yes.
Q. So each time you used your drive stun, there has to be a separate supervisor review?
A. Yes.
    MR. KITTREDGE: May I have a copy of that, Tim?
    MR. KOTFILA: Yes.
    MR. KITTREDGE: Thank you.
Q. (By Mr. Kotfila) Did you have a discussion with Supervisor Stewart about the report?
A. Not that I remember.

Page 51

Q. But he found that the four uses of the drive stun were all appropriate?
A. Yes.
Q. Does the -- at the time of the incident, did the Holyoke Police Department have a policy regarding either use of the Taser or the drive stun?
A. I don't know.
Q. Is that something that you had -- you recall having any training with in the academy?
A. I have had training on it.
Q. And when you say you have had training on it, do you mean the use of the drive stun or the policy behind the use?
A. The use of the drive stun.
Q. Do you know if there is a policy in effect for Holyoke for the use of the Taser and drive stun?
A. I don't know.
    MR. KOTFILA: That's all that I have for you, Officer.
    MR. EMMA: No questions.
    MR. KITTREDGE: I have some

Page 52

questions.
EXAMINATION BY MR. KITTREDGE:
Q. Officer, were you in uniform that day?
A. I was.
Q. What was the uniform of the day?
A. My regular patrol uniform.
Q. Boots, shoes, what?
A. Boots, pants, shirt.
Q. How high are the boots?
A. We have pants that go over the boots, so you only see the heel and the toe.
Q. And how high are the boots on your leg?
A. Maybe to just under the middle of my calf.
Q. And that is the uniform for anybody?
A. On patrol.
Q. That is the uniform of the day for all the patrol officers?
A. Yes.
Q. And everybody working in Holyoke that day was wearing that uniform?

Page 53

A. No.
Q. All the patrol officers were wearing that uniform?
A. Yes.
Q. Otherwise, they would be out of uniform and subject to discipline, right?
A. Yes.
Q. Now, the stun that you said, you said something about five seconds. I was not sure what you meant by the five seconds.
A. When you pull the trigger to a drive stun, you pull it once and automatically it's a five-second rotation. And then you pull it again and it does another five seconds, but it keeps going whether it has contact with the person or not. So if I was to drive stun someone and they are moving but it's not really affecting them, it's still going.
Q. For five seconds?
A. For five seconds.
Q. So each time, if it indicated that you drive stunned somebody four times, that would be a twenty-second period?
A. It didn't drive stun him for twenty

Springfield
413.732.1157

REAL TIME COURT REPORTING
schedule@realtimereporting.net

14
Worcester
508.767.1157