EXHIBIT 6

R. PAUL McCAULEY, Ph.D REPORT

**R. PAUL McCAULEY, Ph.D.**
*Criminologist*
4620 Lucerne Road
Indiana, Pennsylvania 15701

Telephone:
724-349-9676
Fax:
724-349-6477

March 7, 2019

Timothy M. Kotfila, Esquire
Kotfila & Jordan
One Monarch Place, Suite 1340
Springfielf, MA 01144

      Re:   John J. Smith, Jr. v. City of Holyoke, et al.  In the
              United States District Court for the District of
              Massachusetts Western Division
              Civil Action No.:  3:17-cv-30078

Dear Mr. Kotfila:

Please accept this letter as my report for the above-referenced
case.  I reserve the right to amend or supplement this report
should additional information become available.

**I.   QUALIFICATIONS**

I have been an independent consulting criminologist for more
than thirty years and continue in that capacity, engaged in
criminal justice policy and operational research, including
police/law enforcement.   My work includes providing written
testimony to the *President's 21st Century Policing Task Force* and
participating at the Police Executive Research Forum (PERF)
conference (Washington, DC) on *Re-Engineering Police Use of
Force Training.*

Also, I am Professor Emeritus and former Chairman of the
Department of Criminology, Indiana University of Pennsylvania
(IUP).   The University is a comprehensive, doctoral degree
granting institution with an approximate enrollment of 15,000
students.   The Department of Criminology offers bachelors,
masters, and doctorate degrees and has about 1,000 criminology
majors.   I taught and conducted research at all academic/degree
levels.

I am a former Pennsylvania municipal police officer and in that
capacity I engaged in the arrest, handcuffing, transportation
and processing of individuals.   I am a graduate of Her Majesty's

Home Office Police Detective Training Course (Scotland Yard, England.)  For more than twenty-five of my 30 plus year career, I have been a state certified police instructor in Pennsylvania, Kentucky, and Florida.  In my academic duties, as well as in my police training duties, I teach the policies and procedures of police operations.  Also, I have written or published more than 80 professional papers, books, chapters, and technical reports, many of which address the issues concerning police administration, operations, and policies.

For almost ten years I was a member of the faculty of the Southern Police Institute, School of Police Administration, University of Louisville.  In that position I lectured to more than 1,500 police commanders from across the United States, including command officers of state and municipal police, in the area of police operational policy formulation, which included police use of force.  More than 300 of these student officers have become police chiefs.  Also, I have received numerous letters and commendations from police executives for my work and contributions to their agencies.

In 1987, I was a Fulbright Scholar, Australia, lecturing to university faculties of law, justice studies, business, and police commanders, and security directors.  My lecture area was the relationship/interaction between public police and private security in the prevention of crime.

I have been qualified as a police expert in state and federal courts in more than 30 states.  In 1984, I was one of two finalists interviewed for the position of Commissioner of the Pennsylvania State Police.  The Pennsylvania State House of Representatives issued a formal citation recognizing my career and contributions to law enforcement.

Additional information is provided in my curriculum vitae, which is enclosed.

## II.   INTRODUCTION

I was retained by Kotfila & Jordan, to review the case material and render a professional opinion regarding the police operations at approximately 6:14 p.m., on Wednesday, June 25, 2014 involving the above-referenced parties.  My retainer/

minimum of $3,500.00 to which I bill at an hourly rate of $350.00 was paid in advance of my rendering any analysis or opinion and payment was not contingent upon my rendering a favorable opinion.

## III. METHODOLOGY

My examination and analysis of this matter are based on generally accepted qualitative methodologies commonly used in the social sciences.  These techniques include comparative analysis, ethnography/description, content analysis, and case study in assessing compliance with and deviations from accepted police operational and managerial practices.

This report is being offered as an expert forensic report for the purpose of this litigation.  It is based on the best practices of police/law enforcement management and operations and the information provided in the following listed materials.

I offer no medical opinions in this matter.

## IV.   MATERIALS REVIEWED

In the preparation of this report I have reviewed the following materials, which are commonly examined in my profession and discipline in rendering professional/expert opinions:

1. Complaint and Demand for Jury Trial in this matter;
2. Holyoke Police Department Narrative for Officer Crystal L. Manzi;
3. Holyoke Police Department-Use of Force Reports (4) by Officer Crystal L. Manzi;
4. Holyoke Police Department Supplemental Narrative for Officer Samuel Delvalle;
5. Holyoke Police Department Narrative for Officer James J. Farnell- ARREST REPORT;
6. Incident Report State Police Springfield by Trooper Thiago O. Miranda;
7. Copy of deposition transcript of Crystal Manzi;
8. Copy of deposition transcript of James Parnell;
9. Copy of deposition transcript of Samuel Delvalle;
10. Copy of deposition transcript of Thiago Miranda;
11. Video of police pursuit—MSP Air Unit;

12. Massachusetts State Police (MSP) General Order TRF-04 *Motor Vehicle Pursuit*, effective date April 23, 2009;

13. Massachusetts State Police General Order UOF-01 *Use of Force*, effective date June 17, 2013;

14. Holyoke Police Department Standing Operating Procedure, 6.5.1 *High Speed Pursuit Policy*, effective date January 2003.

## V.   SUMMARY OF FACTS

Although numerous facts are in dispute, generally the police report that at or about 6:14 p.m. the Plaintiff, later to become known as John J. Smith, Jr., was seen entering and shortly thereafter leaving a property at 173 Elm Street.  The area is well known as a drug area with drug and weapons arrests.  When Holyoke Police Department (HPD) Police Officers (PO) Lopez and Manzi approached Smith and asked what was going on, Smith walked fast to his Volvo vehicle, entered it, put it in reverse and backed up, going the wrong way on Elm Street.  Lopez and Manzi entered their marked police vehicle, activated overhead emergency lights and signal the driver to stop.  PO Parnell, in his vehicle, joined PO Manzi and both police vehicles activated lights and sirens.  Smith stopped at the red light at Pleasant St. and Hampton St. and Parnell exited his patrol vehicle.  As he walked toward the front of Smith's vehicle, Smith accelerated forward causing Parnell to jump out of the way.  When Smith failed to stop they engaged in the pursuit as Smith entered I-91N.  At this point HPD units were joined by Massachusetts State Police (MSP) ground units and a MSP Air Unit.  PO Padilla was the lead officer in the pursuit.  During the pursuit and Smith's driving, the left rear of Smith's car struck PO Parnell's vehicle.  This pursuit continued through Holyoke and into Westfield.  When the pursuit was to enter Westfield PO Parnell had dispatch contact the Westfield Police Department (WPD) and request they be ready to deploy stop sticks.  The WPD deployed stop sticks effectively.  HPD Officers Bartolomei and Welsh pulled their respective police vehicles to the right and to the left of Smith's Volvo during which Smith's vehicle struck both police vehicles and all three vehicles came to a full stop.  Officers, including PO Manzi and PO Parnell approached the Volvo to remove Smith but he resisted.  He was forcibly removed and taken to the ground.

PO Manzi and PO Delvalle attempted to use their Tasers but the
Tasers were ineffective.  Each officer administered two five
second drive stuns (total 20 seconds) to Smith's body.  PO Manzi
reported the Tasers were ineffective because they could not make
a good contact for use in the drive stun mode.  While on the
ground Smith resisted by not removing his arm(s) from under his
body and struggled.  However, eventually PO Parnell was able to
put Smith's arm behind his back and handcuff Smith.  Smith was
escorted to a police vehicle awaiting arrival of paramedics.

None of PO Manzi's Use of Force Reports were marked "Approved"
by the Bureau Commander.  One of two of PO Delvalle's Use of
Force Reports was "Approved" and signed by the Bureau Commander.

MSP Trooper Thiago O. Miranda reported he was in the SP
Springfield barracks when he heard HPD officers reported they
were attempting to stop a subject who tried to run over an
officer(s).  Later he heard Trps Lahair and Germain take primary
on Route 91.  He and Trp Tucker then left the barracks to assist
Trp Lahair.  Trp Tucker drove and eventually they got behind the
HPD officers/units.  The pursuit came to an end when WPD
deployed stop sticks and the Volvo stopped between two HPD
vehicles.  Trp Miranda immediately exited the police car and
approached the Volvo's trunk area.  He broke out the passenger
window and saw Smith not complying with verbal commands and
fighting multiple officers who were trying to get him out of the
Volvo.  Smith was finally removed from the Volvo and taken to
the ground where he continued to kick and swing his elbows and
fists at officers.  Having noticed a pouch on Smith's belt and
not wanting Smith to access the pouch, Trp Miranda tried to
secure the pouch by going to the ground.  Smith was violently
flailing his body parts.  Trp Miranda struck Smith several times
on the side to make him retract his arms from the pouch area.
After a few strikes Smith moved his arms away.  It took several
officers to handcuff and control Smith.  The pouch was
identified as a double multi tool utility holder.  Trps Tucker
and Miranda advised HPD Capt Pratt of their actions.

Smith's injuries include numerous lacerations and/or fractures
to the head, face, eye, cheekbone, abdomen, injuries to the
right lung and three rib fractures.

Smith's compliant presents a version of facts that is

inconsistent with the version of facts presented in the police
reports.  For example, Smith alleges PO Parnell used his weapon
to strike/pistol whip him but the police reports make no such
mention.  Further, Parnell's narrative falsely reported that
Smith resisted the police.  Further, Trp Miranda, PO Manzi, and
PO Delvalle's misrepresented Smith's level of resistance.  Smith
claims he was render unconscious while on the ground.  Also,
Smith claims at the time of his arrest he had close to $800 on
him.  When he got to the police station he had only $42.00.

**Officer Crystal Manzi testified at deposition** that she was on
the job for one year and was not familiar with a HPD pursuit
policy and was not trained in police pursuits.  She followed
Smith from the Elm St location where he went the wrong way on a
one way street.  PO Parnell joined in the pursuit and when Smith
stopped at the Pleasant St. intersection Parnell exited his
police vehicle and walked toward Smith's Volvo at which time
Smith swerved toward Parnell and fled.  Parnell was the lead
officer and the pursuit continued.  The pursuit distance of the
total pursuit was three to four miles but was not high speed.
She heard radio communication with dispatch in contact giving
pursuit direction, speed and weather.  Although three police
departments were involved the HPD was in charge.  She never
considered terminating the pursuit that was a decision to be
made by the street supervisor.  When the pursuit stopped some
officers had weapons drawn and a trooper had a rifle.  When
Smith was taken to the ground she talked to Smith but he did not
talk to her.  She did not hear anyone giving Smith commands.
She Tasered Smith three or four times in drive stun mode
targeting his left shoulder.  She saw a trooper/someone hitting
Smith's face and a trooper kick Smith.

**Officer James Parnell testified at deposition that he** is a 16
year veteran police officer and had been trained in the police
pursuits.  When Smith drove the wrong way on Elm St. he
responded and backed up PO Manzi.  When Smith and Manzi stopped
at the Pleasant St. intersection he pulled his marked police
vehicle in the other lane, exited his vehicle walked toward
Smith's Volvo, told Smith to shut off his car and to show his
hands.  Smith drove forward and tried to hit him but Parnell
jumped out of the way.  He notified dispatch of the events, the
pursuit continued, and MSP joined the pursuit on I-91.  PO
Padilla got in front of the pursuit and Smith tried to hit

Padilla's police car.  The duration of the pursuit was
approximately 25 minutes.  The HPD has a high-risk approach
procedure.  After the pursuit ended he heard officers' voices
but no specific commands to Smith.  He did not see Smith being
kicked.  Smith was handcuffed by PO Padilla.  He did not strike
Smith with a firearm.

**Officer Samuel Delvalle testified at deposition** that he was on
the job since 2010 and joined in the pursuit when PO Parnell
radioed the incident at Pleasant St., the location, and Smith's
driving behavior.  He was the third or fourth car behind Smith
during the pursuit.  HPD is in charge of this pursuit but when
an Air Unit is involved they assume control.  He is familiar
with the HPD Pursuit policy but he was not trained in it.  After
the pursuit ended he was fairly far back and as he walked toward
the Volvo he saw multiple officer escort/take Smith to the
ground in a prone position.  Smith hands were under his body and
he would not put his hands behind his back and he saw PO Manzi
deploy her Taser two times (the official Taser download
indicates she deployed her Taser four times) and he deployed his
Taser two times—all Taser activations were in drive-stun mode.
He reported the Taser was not effective.

**Trooper Thiago Miranda testified at deposition** that he was on
the job since 2012.  He and Trp Tucker were at the barracks when
they heard HPD in pursuit and left to join the pursuit.  Trp
Tucker drove and Trp Miranda was the passenger and during the
pursuit they did not discuss terminating the pursuit.  The
Trooper driving is responsible for radio communication during a
pursuit.  When they joined the pursuit stop sticks had been
deployed and two HPD vehicles were blocking the Volvo.  No one
was in charge of this incident, as each officer was responsible
for reacting to whatever they came upon.  HPD officers were not
in charge just because they were behind the Volvo.  When the
pursuit ended he exited his vehicle, took his patrol rifle,
went to the Volvo and made sure the trunk was closed, then
looked in the rear passenger window.  The window was not clear
and he used his rifle to break the rear passenger window.  When
he was able to look inside he observed multiple officers
removing Smith from the driver's side.  Smith was not obeying
commands and he put his rifle on a vehicle and knelt down on the
ground near Smith to help control him.  Smith's legs were
kicking and his body/elbows were moving.  He struck Smith

multiple times on the side and told Smith to stop resisting-stop fighting.  He did not see any officer Taser Smith and he never kicked Smith.  His Use of Force Report indicates he used closed fists.

Additional Information

The FBI Uniform Crime Report 2014 reported the Holyoke Police Department had 136 sworn officers.

Police Video of this Incident speaks for itself.

Mr. Smith's federal complaint/lawsuit was filed June 22, 2017.

VI.   ANALYSIS AND DISCUSSION

Although it is not my role to decide issues of credibility, generally accepted social science technique requires that I comment on apparent inconsistencies, assertions of interested witnesses which are contrary to logic or other facts.  Further, while I do not resolve credibility issues, I have offered opinions based upon alternate, legitimate factual disputes. Ultimately, it will be for a jury to determine what facts to apply.  My duty is to provide my professional opinions, some of which are dependent upon alternate versions of disputed factual scenarios.

(Note:  TASER™ is a registered trademark of TASER International and is one of several manufactures of Conducted Energy Weapon (C.E.W.) further described as an Electro-Muscular Disruptor (E.M.D.) and Electronic Control Weapon (ECW).  For the purpose of this report I shall use the term TASER since it is the device used by the HPD.

Question to be answered:  Was the use of force used by the defendant police officers against Smith, who sitting in the driver's seat of his stopped vehicle (Volvo), after the police vehicle pursuit concluded excessive force?

Answer to the question:  To answer this question and to better understand the police use of force, my analysis and opinions consider the use of force, not in isolation, but in the context of both police officer conduct and police department factors

before, during, and after the moment officers used force against
Mr. Smith.

A.   Preliminary Commentary

This case involves a police-citizen pedestrian contact and a
police vehicle pursuit that ends with the police use of force
after Mr. Smith is stopped and removed from his vehicle.   In
order to understand better the police use of force involving Mr.
Smith that occurred at the end of this series of events, it is
important to describe the totality of the circumstances from the
beginning of the events.

This incident started when police approached Smith on the
street, as a police-citizen contact, in an area known to police
as having drug and weapons arrests.   At this time Smith walked
away and fled in his Volvo.   When Smith got into his vehicle he
drove the wrong way on a one-way street and later violated a
traffic light, the police began to make a vehicle stop.   When he
did stop, an officer approached on foot at which time the
officer perceived Smith tried to hit the officer with his
vehicle, causing the officer to jump out of the way.   The
resulting vehicle pursuit went into four cities and involved
three police departments and at least six police vehicles and a
State Police helicopter Air Unit.   With these facts, this was a
HIGH RISK VEHICLE STOP AND APPROACH.

**Need for an Internal Affairs Investigation**

Additionally, after this complex and dangerous operation, no
internal investigation has been produced.   Even after the
involved police departments received notice of this
lawsuit,(lawsuit was filed June 22, 2017) no internal affairs
investigations were conducted.   This signals to the involved
officers and other officers that their continued misconduct
would have no adverse affect on their police careers.

The U.S. Department of Justice states, in part;

> **1.9 Complaints and lawsuits.**  Complaints that are legal
> claims against the agency or any of its personnel for on-
> or off-duty conduct under color of authority should be
> coordinated with the agency's or city's risk management

unit and the attorneys representing and defending the city in civil matters.

Any civil lawsuit or civil claim filed against a municipality, agency, or law enforcement personnel for misconduct on duty or off duty under color of authority should be handled as a complaint.

U.S. Department of Justice, Office of Community Oriented Policing Services. *Standards and Guidelines for Internal Affairs*, 2008.

It is important to understand that a primary purpose of completed internal affairs investigations, whether by an internal affairs unit or by police administration generally, is to identify problems and issues about written directives, policies, supervision, training, and tactics. In simplistic terms it is a process to police the police. Completed internal investigations provide a foundation for feedback to the policymaker so appropriate corrective actions (enhanced policies, procedures, training, and supervision) can be developed, implemented, and evaluated.

Reasonable IAIs by the respective agencies would include, but not limited to the following:

· Did HPD officers have reasonable suspicion to approach and question Smith in the drug-weapons area
· Did PO Parnell correctly approach, on foot, the Volvo at Pleasant Street
· Who was primary unit and how did PO Padilla get in front of PO Parnell the primary unit
· How many pursuit miles and time were involved
· Did HPD provide dispatch and supervisor with required information when initiating and updating during the pursuit
· Was an HPD supervisor monitoring the pursuit and evaluating the risk-benefit to decide whether to continue or terminate it
· Who authorized more than two HPD units in the pursuit and the boxing-in of the Volvo with two police vehicles
· Does HPD Standard Operating Procedure (SOP) 6.5.1 *High Speed Pursuit Policy* need to be reviewed since it does not include low speed-sustained or high-risk/felony pursuits

- Does the HPD need to create a new policy/SOP to address high-risk/felony stops
- Did HPD request the MSP to assist in the pursuit
- Did MSP join the pursuit at request to HPD or contrary to MSP General Order TRF-04 *Motor Vehicle Pursuit*
- What is procedure for pursuit command when Air Unit is involved
- How did Trps Lahair and Germain become primary pursuit units as Trp Miranda reported and why
- Did troopers provide required information during the pursuit and if not did the Troop Duty Officer terminate the pursuit (MANDATORY by General Order TRF-04)
- Was the use of the spike strip/stop sticks requested by the HPD and authorized by the Westfield Police Department (WPD)
- Who was the Officer-in-Charge (OIC) at the pursuit stop
- Why did officers approach the Volvo from the front when the driver may have a firearm
- What tactical violations occurred that put the officers at increased danger
- Was Smith unconscious and his level of resistance
- Why did the Air Unit camera twice focus away from the active physical encounter
- Overall, what policies and training units are applicable to this incident
- Publish the findings and disposition of the investigation for each officer

Although the respective police departments should have formal policies on conducting IAIs that is insufficient.  In <u>Beck v. City of Pittsburgh</u> the Third Circuit Court of Appeals said, "Formalism is often the last refuge of scoundrels."  That Court also said,

> The [internal] investigation process must be real.  It must have some teeth.  It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done.  The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens.

Further, department policies and procedures are the foundation for training and state **what** is to be done and **why**.  It is the

agency's policies and procedures on which an officer must be trained.  Training is the organizational process that allows the policymaker to translate policies to be practiced by the officers, consistent with the law and the policymaker's intentions.  Training is the organizational function/activity that informs the officers **how** to do what is expected.

The respective departments' failures to review and compare the video evidence with the official version of facts presented by the other officers for factual discrepancies is contrary to accepted IA practices.  Further, these failures do not allow for the departments to take corrective actions, including policy changes or creating additional policies and procedures, remedial training, and discipline.

B.   High Risk Vehicle Stop

At the expense of being repetitious, this incident originated under circumstances where the driver, Smith, was in a crime area where drug and firearm arrests were known to the officers. Subsequently, a police officer on foot had to jump out of the way of Smith's vehicle, and it appeared to police that Smith intentionally tried to hit a police vehicle during the pursuit. Further, the pursuit was estimated to have continued for three-to-four miles and for 25 minutes with at least six police vehicles involved from multiple jurisdictions.  When the Volvo stopped officers exited their vehicles some officers immediately unholstered their weapons, a Trooper exhibited a patrol rifle, a police K-9 was on site, and a MSP helicopter was overhead.  THIS WAS A HIGH RISK VEHICLE STOP.  If this is disputed in anyway, then the pursuit should have been terminated either by the lead/primary pursuit officer or his/her supervisor.  The current emphasis in law enforcement is on the balance of risk and benefit and whether a logical and reasonable process of evaluation is in place and actively followed within an agency for monitoring police vehicle pursuit operations.  Clearly, this complex and prolonged pursuit was not justified to apprehend a traffic violator—wrong way on a one way street.

C.   Police Tactics:   The Approach

The International Association of Chiefs of Police (IACP) Model
Policy *Motor Vehicle Stops*, December 2006 states in part;

> IV. E. 3.  Making High-Risk Vehicle Stops
>
> After selecting an appropriate location and with adequate
> support units in position, the officer should signal the
> suspect to stop.  Officers shall then follow department
> training for vehicle positioning and the removal and
> securing of occupants.

The IACP Training Key #294 *Felony Vehicle Approaches* (1981),
which is a high-risk stop and applicable to the instant matter,
states in part:

> After both vehicles are stopped, the officer should exit his
> patrol unit quickly.  [the police vehicle is toward the rear
> of the suspect vehicle]  The officer is well protected by
> being behind the suspect and under cover.  In order to
> assault officer, the suspect must turn around and thereby
> expose himself to attack.  At this point, the officer's
> general objective is to maintain the advantage and increase
> his control over the suspect.
>
> Once the officer is under cover and has positioned himself
> to take defensive action, he will issue verbal commands.
> Use of the vehicle's public address system can make the
> officer's commands more easily heard by the suspect if the
> vehicle's windows are not rolled down.
>
> Only one verbal command should be given at a time.  The
> issuance of more than one command at a time may confuse the
> suspect or other officers. [only the OIC on site should give
> commands]
>
> TOO MANY OFFICERS:  Too many officers at the scene of a
> felony stop can be counterproductive.  Unknowingly they may
> come into the line of fire, distract officers already at the
> scene, or draw a crowd.  Whatever happens, the stopping
> officer should remain in his position of cover.  The
> stopping officer should communicate to the other officers
> and direct them to positions of cover while he maintains
> control over the felon.  If the officer is unable to direct

the other officers effectively, he should maintain his
cover.

Considering the general perception of the primary involved
officer this was a high-risk vehicle stop of a subject who may
have a firearm and who may attempt to use his vehicle as a
weapon.

As Trp Miranda testified, "No one was in charge" and as can be
seen on the video the result was no operational discipline.
Rather than officers exiting their police vehicles and moving to
cover (because the driver may be armed) and having **only** the OIC
giving Smith simple and clear commands/instructions, the
officers advanced in the open toward the Volvo, virtually
surrounding the Volvo. Further, with officers walking **on** the
Volvo they effectively created a circular firing squad placing
officers in crossfire/friendly-fire positions. The objective is
such a vehicle stop is not for the police to go to Smith but to
give Smith directions causing him to come to the police. This
approach increases the safety of the officers and Mr. Smith.
This lack of operational discipline is a function of the absence
of inter-department communications (police from the different
police departments do not have compatible radio communication
systems) resulting in the inability of the OIC to effectively
coordinate the police activities.

D.   Use of Force Standard of Analysis

The standards for analyzing officer's use of force are
applicable federal, Massachusetts laws, and the HPD Policies
and Procedures. The use of deadly force by the involved
officers has legal, police policy, training and other
considerations. The legal standard of analysis is the Supreme
Court decision in Graham v. Connor, which stated in part:

> The calculus of reasonableness must embody allowance for the
> fact that police officers are often forced to make split-
> second judgments in circumstances that are tense, uncertain,
> and rapidly evolving - about the amount of force that is
> necessary in a particular situation.

Graham v. Connor provides the general framework for assessing
whether a particular use of force is legal under the Fourth

Amendment.  This, like most general standards found in Fourth
Amendment precedent, operates through a balancing test.
Courts applying this test must pay "careful attention to the
facts and circumstances of each particular case, including the
severity of the crime at issue, whether the suspect poses an
immediate threat to the safety of the officers or others, and
whether he is actively resisting arrest or attempting to evade
arrest by flight."  This judgment is made "from the perspective
of the reasonable officer on the scene rather than with the
20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 395
(1989).

In Massachusetts to acquire police certification, all municipal
police officers are to be trained in the use of force.  This
training must be consistent with police department policies and
procedures, which in turn must be consistent with established
statutory and constitutional laws.

> To assist officers to understand the levels of force that
> may be used under varying degrees of resistance by a
> suspect, some version of a use of force continuum is
> commonly used in police training.  The *Use-of-Force
> Continuum* as presented here consists of five steps and is
> presented, as an example:

> Most law enforcement agencies have policies that guide
> their use of force. These policies describe a escalating
> series of actions an officer may take to resolve a
> situation. This continuum generally has many levels, and
> officers are instructed to respond with a level of force
> appropriate to the situation at hand, acknowledging that
> the officer may move from one part of the continuum to
> another in a matter of seconds.

An example of a use-of-force continuum follows:

- **Officer Presence** — No force is used. Considered the best
  way to resolve a situation.

  - The mere presence of a law enforcement officer works
    to deter crime or diffuse a situation.

  - Officers' attitudes are professional and
    nonthreatening.

**Verbalization** — Force is not-physical.

- o Officers issue calm, nonthreatening commands, such as "Let me see your identification and registration."

- o Officers may increase their volume and shorten commands in an attempt to gain compliance. Short commands might include "Stop," or "Don't move."

**Empty-Hand Control** — Officers use bodily force to gain control of a situation.

- o *Soft technique.* Officers use grabs, holds and joint locks to restrain an individual.

- o *Hard technique.* Officers use punches and kicks to restrain an individual.

**Less-Lethal Methods** — Officers use less-lethal technologies to gain control of a situation.

- o *Blunt impact.* Officers may use a baton or projectile to immobilize a combative person.

- o *Chemical.* Officers may use chemical sprays or projectiles embedded with chemicals to restrain an individual (e.g., pepper spray).

- o *Conducted Energy Devices (CEDs).* Officers may use CEDs to immobilize an individual. CEDs discharge a high-voltage, low-amperage jolt of electricity at a distance.

**Lethal Force** — Officers use lethal weapons to gain control of a situation. Should only be used if a suspect poses a serious threat to the officer or another individual.

- o Officers use deadly weapons such as firearms to stop an individual's actions.

(National Institute of Justice, August 4, 2009)

MSP General Order UOF -01 is consistent with accepted police administrative practices.

It is critically important that officers understand that the use
of force by police is in response to resistance presented to
them by the subject.  In the instant matter, and accepting that
Smith was on the ground and unconscious, he was unable to
resist, and with the absence of any resistance any force by the
police is unnecessary and excessive force.  Further, any officer
kicking Smith in the face, head, or neck would only be permitted
if deadly force was justified.  From the evidence, this was not
a deadly force situation and kicking Smith in the face, head, or
neck/spine was unnecessary, excessive, and contrary to accepted
police practices.

PO Manzi and PO Delvalle's use of the Taser in drive-stun mode
generally and without giving warning, is problematic.    The
Police Executive Research Forum (PERF) and the Community
Oriented Policing Services (COPS) United States Department of
Justice, *2011 Electronic Control Weapons (ECW) Guidelines,* March
2011 state, in part:

> Drive Stun:  Avoid use as a pain-compliance tactic
> The most commonly used ECWs can be used in two modes:
> probe and drive stun.  Many police managers and officers
> erroneously believe that applications of drive stun are as
> effective as applications with probes, but that is not
> correct.  The drive stun mode can be used to complete the
> circuit in the event that one of the probes is ineffective
> or becomes dislodged.  The drive stun mode can also be used
> in close quarters for the purpose of protecting the officer
> or creating a safe distance between the officer and
> subject.  Absent these circumstances, using the ECW in
> drive stun mode is of questionable value.  The primary
> function of the drive stun mode, when not used to
> complete the circuit, is to gain subject compliance
> through the administration of pain.  **Using the ECW to
> achieve pain compliance may have limited effectiveness
> and, when used repeatedly, may even exacerbate the
> situation by inducing rage in the subject.**  For these
> reasons, agencies should carefully consider policy and
> training regarding when and how personnel use the
> drive stun mode, and should discourage its use as a pain
> compliance tactic.  Drive stun has an applicable but
> limited purpose that should be taught, explained, and

monitored during ECW training and field use (p. 14).

16. Agencies' policy and training should discourage the use of the drive stun mode as a pain compliance technique.  The drive stun mode should be used only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject so that officers can consider another force option.

22. A warning should be given to a subject prior to activating the ECW unless doing so would place any person at risk.  Warnings may be in the form of verbalization, display, laser painting, arcing, or a combination of these tactics (p.20).

> Note:  PERF is the research-policy organization for the major police departments (500 officers or more) in the United States.

## VII.   OPINIONS WITH RELEVANT COMMENTS

Based on my review of the above-listed materials, my experience and professional qualifications in criminology, criminal justice organizations, student intern supervision, operations, and procedures, I offer, in addition to or with all opinions expressed above, the following opinions within a reasonable degree of professional certainty.

1.   The harm suffered by Mr. Smith was the foreseeable consequence of the defendant officers' reckless conduct.

2.   The defendant officers' actions and/or inactions were substantial contributing factors causing the harm suffered by Mr. Smith.

3.   Accepting Mr. Smith was unconscious, not responsive, and not resisting the police use of physical force including punching and kicking Smith was unnecessary and excessive force.

4.   Accepting Mr. Smith was unconscious, not responsive, and not resisting, the police use of non-lethal force including

deploying the Taser in drive-stun mode against Mr. Smith was unnecessary and excessive force.

5.   Accepting Mr. Smith was actively resisting and not complying with police commands, the use of physical force including punches to the body as pain compliance was consistent with accepted police practices.

6.   From the evidence, this was not a deadly force situation and kicking Smith in the face, head, or neck/spine was unnecessary, excessive, and contrary to accepted police practices.

7.   With the combined weight and strength of the defendant officers to control Mr. Smith, as seen on the video, any shoed kicks to Mr. Smith's head, face, neck, or spine was the unnecessary use of deadly force.  Mr. Smith did not present the officers with a deadly force situation.

8.   The involved police departments' lack of response to Mr. Smith's lawsuit reflects an organizational indifference to holding officers accountable when engaged in reckless tactics and use of unnecessary and excessive force.  This failure jeopardizes the safety of both police officers and citizens.

9.   The HPD and the MSP failed to provide the involved officers with reasonable vehicle pursuit and high risk vehicle stop policies, procedures, training, and field supervision.  These failures were inconsistent with accepted police practices and procedures, and were substantially responsible for the harm suffered by Mr. Smith.

This report is signed under penalty of perjury that the foregoing is true and correct.

Sincerely,



R. Paul McCauley, Ph.D.

Attachments

Copy of Curriculum Vitae - R. Paul McCauley, Ph.D.
List of cases in which testimony has been offered the past four
years