# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

—————————————————————————
                                          )
**JOHN J. SMITH, JR.,**                   )
                                          )
       **Plaintiff,**             )      **Civil Action No.**
                                          )      **17-30078-FDS**
     **v.**                         )
                                          )
**THE CITY OF HOLYOKE,**                  )
**JAMES PARNELL, CRYSTAL MANZI,**         )
**SAMUEL DEL VALLE, and**                 )
**THIAGO A. MIRANDA,**                    )
                                          )
      **Defendants.**            )
—————————————————————————)


## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

**SAYLOR, C.J.**

     This is a civil rights action alleging the use of excessive force during an arrest. After committing a minor traffic violation, plaintiff John J. Smith, Jr., refused to stop for police officers attempting to ticket him. Instead, he led them on a high-speed chase for several miles that ended when officers deployed spike strips to flatten his tires. According to Smith, he was then pulled out of the car, struck in the head with a gun, beaten, and tasered while unconscious. According to the police, he refused to obey commands and resisted arrest. Smith alleges that he received multiple injuries at the hands of the police, including lacerations and broken bones in his face and ribs.

     Smith has brought suit against four of the officers involved in the arrest and the City of Holyoke, alleging federal claims under 42 U.S.C. § 1983 and various related state-law claims. The City of Holyoke and Holyoke Police Officers James Parnell, Crystal Manzi, and Samuel Del

Valle have moved for summary judgment on the federal claims, and have moved for dismissal of the state-law claims should summary judgment be granted.[1]

It is not disputed that Smith led police on a high-speed chase, putting multiple people at great risk. But even reckless, dangerous behavior does not give the police *carte blanche* to do anything they please once they apprehend a suspect; all use of force must be reasonable and proportional to the circumstances. And once the suspect is subdued, and not resisting arrest, the degree of permissible force is substantially reduced.

Because there is substantial evidence (if believed) that the police used excessive force here, the officers do not enjoy qualified immunity for their actions. Accordingly, and for the following reasons, defendants' motion for summary judgment will be granted in part and denied in part.

## I.    Background

### A.    Factual Background

The following facts are as set forth in the record and are undisputed except as noted.

On June 25, 2014, police officers Crystal Manzi and Jabet Lopez were on patrol in a police cruiser on Elm Street in Holyoke, Massachusetts. (Manzi Dep. 10-11). Elm Street is a one-way street. (*Id.* at 12).[2] At around 6:00 or 6:15 P.M., they observed John J. Smith, Jr., walking out of a building at 173 Elm Street toward his car. (*Id*. at 12-13). Officer Manzi thought that he looked "suspicious" because he was "walking very fast," "as if he was trying to avoid [the officers]." (*Id.* at 14). Smith was not carrying anything, he was not walking with

---

[1] Defendant Thiago Miranda, a Massachusetts State Trooper, has not moved for summary judgment.

[2] Officer Manzi described the area as a "high gang/drug block" and stated that "there are lots of narcotics that come in and out of the building and the surrounding buildings." (Manzi Dep. 12). Smith "denies the area is 'notorious for illegal drug and gang activity.'" (Pl.'s Response to Def. Statement of Facts ¶ 2).

difficulty, and he did not appear impaired. (*Id.* at 14, 18). Officer Lopez asked Smith "how are you doing, what are you doing in this building." (*Id.* at 15). Smith responded verbally, although Officer Manzi does not remember what he said. (*Id.*). At the point that Smith got into his car to drive away, he was free to leave and neither of the officers had attempted to stop him. (*Id.* at 20).

Smith then placed his car in reverse and backed it up Elm Street, against the one-way flow of traffic, until he reached the next block at the intersection of Elm and Suffolk Street. (Manzi Dep. 17, 20-21). According to Smith, he reversed his car because the police cruiser was blocking the street. (Smith Dep. 42). Officer Manzi began to pursue him with the intention of speaking to him and possibly giving him a traffic citation for driving the wrong way down a one-way street. (Manzi Dep. 21). Officer James Parnell of the Holyoke Police Department, who was in a cruiser nearby, received a dispatch about a car driving the wrong way down Elm Street, and joined the pursuit. (Parnell Dep. 7, 12). Smith turned onto Suffolk Street, a two-way street, and began driving with the flow of traffic, with Officers Manzi and Parnell behind him in their cruisers. (Manzi Dep. 17; Parnell Dep. 13). The officers activated their lights. (Parnell Dep. 14).

It is undisputed that Smith was aware that police officers were following him with lights and/or sirens on, and that he did not stop. (Smith Dep. 165).[3] Instead, he led the police officers through the streets of Holyoke onto Interstate Highway 91. He exited the highway in Northampton, eventually driving into Westfield. (Parnell Dep. 20, 22, 25). His car reached a speed of 90 miles per hour on the interstate. (Smith Dep. 166). Massachusetts State Police and Westfield Police units joined the Holyoke Police units in the pursuit. (Manzi Dep. 29). The

---

[3] According to Smith, he could hear the sirens and was aware that he was being followed by Holyoke police cruisers, but he could not see the cars or their lights because they were several blocks behind him. (Smith Dep. 75-76).

entire pursuit lasted between 20 minutes (by Officer Parnell's estimate) and 45 minutes (by Smith's). (Parnell Dep. 25; Smith Dep. 166).

Smith's specific actions during the pursuit are disputed. At one point, he was stopped at a red light. According to Officer Parnell, he got out of his cruiser and approached Smith's car, giving him verbal commands to shut off the car and show his hands. (Parnell Dep. 16). Smith accelerated toward Officer Parnell, forcing him to jump out of the way. (*Id.*). Officers Parnell and Manzi both interpreted that action as an attempt to hit the officer with his car. (Parnell Dep. 19; Manzi Dep. 24).[4] Smith denies that he attempted to hit a police officer with his car, that Officer Parnell jumped out of the way, or that he could even see any officers, because they remained several blocks behind him. (Pl.'s Response to Def. Statement of Facts ¶¶ 11-13; Smith Dep. 75).

Officer Parnell also testified that he observed Smith "almost cause a traffic collision" with other vehicles when he drove into the breakdown lane and forced other vehicles to stop. (Parnell Dep. 21-22).[5] Smith denies that he almost collided with any vehicles. (Pl.'s Response to Def. Statement of Facts ¶ 17).

Officers Parnell and Manzi testified that Smith swerved his car toward a cruiser being driven by Holyoke Police Officer Padilla, which they interpreted as an attempt to hit Padilla's car. (Manzi Dep. 27; Parnell Dep. 22-23). Smith's car did not, however, make contact with the other car. (Manzi Dep. 27; Parnell Dep. 23). Smith denies that he intentionally swerved at, and almost struck, the car. (Pl.'s Response to Def. Statement of Facts ¶ 19).

---

[4] According to Officer Manzi's deposition, she observed the entire interaction. (Manzi Dep. 24). However, she did not mention the alleged attempt to run over Officer Parnell in her incident report. (Manzi Incident Report; Pl. Ex. 7). When asked why she did not include it in her incident report, Officer Manzi stated that she was "brand new" to the force and forgot to include it because "there was a lot going on." (Manzi Dep. 25).

[5] The term "breakdown lane" is used in Massachusetts to describe the paved shoulder of a highway.

The pursuit ended in Westfield. Officers deployed spike strips across the road, which flattened the tires of Smith's car and caused it to come to a gradual stop about 300-400 feet away from the spike strips. (Parnell Dep. 25; Smith Dep. 92-93).[6] Smith was wearing his seatbelt and did not suffer any injuries as a result of hitting the spike strips. (Smith Dep. 93, 106).

The parties disagree about what happened after the car came to a stop. Smith has submitted a video taken by a Massachusetts State Police helicopter that depicts the 53-second period immediately following the stop. Unfortunately, the video does not definitively prove or disprove any party's account of the events. (Video; Pl. Ex. 1).

The following account is based on the testimony of the officers. Officer Parnell approached the driver's side of Smith's car once it came to a stop. (Parnell Dep. 35). He and several other officers dragged Smith out of the car and put him on the ground. (Manzi Dep. 33; Parnell Dep. 40). He was lying face down on the ground with his hands beneath him, ignoring commands to place his hands behind his back and show his hands. (Parnell Dep. 43; Manzi Dep. 34; Del Valle Dep. 22). According to Trooper Miranda, he was kicking his legs and swinging his elbows, arms, and fists, such that the officers had difficulty in gaining control of him. (Miranda Dep. 39-40). Trooper Miranda hit him in the side to "gain compliance control" over him, but could not remember how many times he hit him. (*Id*. at 40). Officer Manzi used her Taser to "drive stun" him three or four times, attempting to get him to stop lying on his hands so he could be handcuffed. (Manzi Dep. 34, 36-38).[7] Officer Del Valle used his Taser to drive stun him twice, as other officers attempted to pull his arm out from under him. (Del Valle Dep. 30-

---

[6] Smith and Officer Parnell refer to these objects as "stop sticks." "Stop Stick" is a brand of spike strip, that is, a spiked device meant to deflate the tires of a car. *See* STOP STICK, https://www.stopstick.com/products/stop-stick (last visited Feb. 26, 2020). The generic term "spike strip" will be used to refer to the objects used in this case.

[7] In "drive stun" mode, the Taser device is physically pressed against a person's body. (Del Valle Dep. 24-25). The purpose of using a Taser is "pain compliance." (Manzi Dep. 35-36).

31).  Officer Parnell physically removed Smith's right arm from under him, to put it behind his back so he could be handcuffed.  (Parnell Arrest Report 2; Pl. Ex. 2).  Again, according to the officers, all of this occurred while Smith was lying face down on the ground, allegedly struggling, resisting, and refusing to put his hands behind his back.

Smith disputes that account.  According to him, soon after his car stopped, a police dog came in through his passenger-side window.  (Smith Dep. 110).  He turned his head toward that window.  At that point, he immediately lost his memory, describing it as "one big black spot." (*Id*. 111-12).  Based on the video evidence, Smith alleges that Officer Parnell struck him in the head with a gun, causing him to lose consciousness.  (Compl. ¶¶ 36, 39).  The officers then pulled him out of the car and put him on the ground.  (Comp. ¶¶ 42, 44).  Because he was unconscious, he did not struggle, kick, swing his fists, or refuse to yield his arms.  (Pl.'s Response to Def. Statement of Facts ¶¶ 35, 36, 40).  Rather, he was limp and not moving. (Compl. ¶¶ 43, 52).  He regained consciousness in the ambulance.  (Smith Dep. 112).

The video does not provide definitive answers.  It begins by depicting Smith's car swerving to a stop on a paved road.  (Video; Pl. Ex. 1).  At the eight-second mark, seven police cruisers surround Smith's car, with two jammed against both sides of his car, and officers begin to get out of their vehicles.  At 10-13 seconds, at least nine police officers converge on Smith's car from all directions, some with their weapons drawn and pointed at the car. There are now nine cruisers at the scene.  An officer releases a police dog into the passenger-side window as Officer Parnell approaches the driver-side window.[8]  At 13-17 seconds, Officer Parnell ducks so that he is level with the driver-side window.  He then straightens up and hands a large black

---

[8] Officer Parnell identified himself as the person between the driver's side of Smith's car and the police cruiser at the 12-second mark.  (Parnell Dep. 35).

object, which could be a gun, to the officer behind him, who walks away with it. At 17-19 seconds, and then in a close-up at 19-22 seconds, Officer Parnell and at least three other officers pull Smith out of the car by his arms and pin him on the ground. At that point, two officers have climbed on the roof of Smith's car. At 27-28 seconds, three officers are on top of Smith, who is lying on the ground, with three other officers within arm's length.

Smith contends that the video shows his right arm lying limp above his head. (Pl.'s Mem. in Supp. of Opp. to Mot. for Summ. J. 9). The video is quite blurry, but it does show light-colored shapes on the ground where his head and right arm could be; the rest of his body is obscured by the officers on top of him. At 28-31 seconds, the camera zooms out to show at least four officers on top of Smith, with ten other officers nearby. There are now eleven police cruisers at the scene. One can faintly see Smith's head and what looks like one or two of his arms on the ground above his head. He is not moving. While immobile, Trooper Miranda punches him in the side at least four times.

At 32 seconds, the operator of the video camera—for no reason that is apparent in the record—turns the camera away from the scene of the arrest and focuses on some foliage and the empty road. That footage lasts seven seconds. At 39 seconds, the camera swings back to the officers and Smith, whose body is obscured by at least five officers on top of him. The camera then zooms out and the video ends at 53 seconds.

After he was handcuffed, Smith was transported by ambulance to the Holyoke Medical Center Emergency Room. (Parnell Arrest Report 2; Pl. Ex. 2). According to Smith, he suffered lacerations to the head, face, chest, and abdomen; a fracture of the anterior and posterolateral and medial wall of the left maxillary sinus that extended to the posterolateral left orbital wall; hemorrhagic fluid in the left maxillary sinus; right-sided pneumothorax caused by trauma; small

contusion and atelectasis of the right lung; three rib fractures; dislodged and broken dentures; and subcutaneous emphysema. (Compl. ¶¶ 69, 70, 73).

However, Smith failed to include any medical records with his opposition to summary judgment, and failed even to submit an affidavit setting forth his own understanding of his injuries. Attached to the complaint were a CT scan of his face and X-rays of his ribs, taken at Holyoke Medical Center and Baystate Medical Center on June 25 and 26, 2014. (Compl. Ex. 2; Compl. Ex. 3). Even assuming that the Court can consider those documents, it cannot interpret them as a radiologist. The evidentiary record as to Smith's injuries is therefore quite limited. In any event, it appears to be undisputed that he required transport by ambulance; that a medical professional made the judgment he should receive a CT scan of his face and an X-ray of his chest; and that he suffered at least some degree of facial and torso injuries. It is also undisputed that Smith was not injured at the time his car came to a stop.

Smith was arrested and indicted on charges of driving to endanger, Mass. Gen. Laws ch. 90, § 24; refusal to submit to police officer, Mass. Gen. Laws ch. 90, § 25; leaving the scene of property damage, Mass. Gen. Laws ch. 90, § 24; and two counts of assault by means of a dangerous weapon, Mass. Gen. Laws ch. 265, § 15B(b). (Def. Ex. 9). On June 23, 2015, he pleaded guilty to reckless operation of a motor vehicle, Mass. Gen. Laws ch. 90, § 24(2)(a), and was sentenced to two years' incarceration, with the remaining charges dismissed by *nolle prosequi*. (Def. Ex. 10).

It is unclear what follow-up measures the Holyoke Police Department took after the event. Defendants allege, and Smith concedes, that Officers Manzi and Del Valle completed and submitted "Use of Force" reports concerning their Taser use, and that their supervisors concluded that the use of force was appropriate under the circumstances. (Def. Statement of

Material Facts ¶ 41; Pl.'s Resp. to Def. Statement of Facts ¶ 41).  However, defendants did not submit any Use of Force Reports as part of the evidentiary record.  The complaint alleges that the City of Holyoke failed to conduct an internal-affairs investigation of Smith's complaint of excessive force, even after his counsel filed a notice of presentment under the Massachusetts Tort Claims Act.  (Compl. ¶¶ 86-87).  However, there is no mention of an internal-affairs investigation, or the absence of such an investigation, in any of the affidavits or deposition excerpts submitted by either party.

The defendant officers appear to have varying levels of familiarity with the relevant Holyoke Police Department policies governing Taser use and vehicular pursuit.  The Holyoke Police Department has Standard Operating Procedures governing "Use of Force" (including Taser use), "Vehicular Pursuit," and "High Speed Pursuit."  (Def. Ex. 11).  Officer Manzi stated that she was not familiar with the Holyoke Police Department's pursuit policy or Taser policy as of the date of Smith's arrest.  (Manzi Dep. 22-23, 51).  Officer Parnell stated that he was familiar with the pursuit policy, that such familiarity was mandatory, that he would expect other Holyoke officers to know the policy, and that he understood the decision to continue the chase was discretionary.  (Parnell Dep. 25-27, 30).  Officer Del Valle did not say he was unfamiliar with the relevant procedures.[9]

---

[9] Smith alleges that Officer Del Valle testified at his deposition that it was "not his call" to discontinue the pursuit, and that his statement is inconsistent with the department high-speed pursuit procedure, which provides that an officer's decision to join or discontinue a chase is discretionary.  (Def. Ex. 11C).  Smith quotes page 18 of Del Valle's deposition, which was not provided to the Court.  (Pl.'s Mem. in Supp. of Opp. to Mot. for Summ. J. 13).  Allegedly, the following exchange occurred:

Q.  At any point, Officer, did you consider discontinuing the pursuit?

A.  No.

Q.  And you realize that pursuant to the policies that is an option, if you exercise your discretion?

A.  On that date, in this incident, I don't think it was my call.

### B. Procedural Background

Smith filed this suit on June 22, 2017, against the City of Holyoke, Holyoke Police Officers James Parnell, Crystal Manzi, and Samuel Del Valle, and Massachusetts State Police Trooper Thiago O. Miranda. The complaint alleges seven claims: (1) a claim under 42 U.S.C. § 1983 for excessive force in violation of the Fourth and Fourteenth Amendments; (2) a claim under 42 U.S.C. § 1983 against the City of Holyoke for failure to train, supervise, investigate, and/or discipline its police officers; (3) a claim under Massachusetts law for assault and battery and assault and battery with a dangerous weapon; (4) a claim for violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 112, § 111M; (5) a claim under Massachusetts law for intentional infliction of emotional distress; (6) a claim under Massachusetts law for malicious prosecution against Officer Parnell; and (7) a claim under 42 U.S.C. § 1983 for civil conspiracy to deprive Smith of his constitutional rights. All claims except the malicious prosecution claim (Count 6) and the *Monell* claim (Count 2) are asserted against Officers Parnell, Manzi, Del Valle, and Trooper Miranda.

Defendants the City of Holyoke and Officers Parnell, Manzi, and Del Valle have moved for partial summary judgment on the federal-law claims for excessive force (Count 1), the *Monell* claim (Count 2), and civil conspiracy (Count 7). They have also moved to dismiss the state-law claims (Counts 3, 4, 5, and 6) should this Court grant summary judgment on the federal-law claims. Alternatively, the City of Holyoke has moved to bifurcate the *Monell* claim (Count 2) from the individual claims against the defendant police officers (Counts 1, 3-7) and to stay it until disposition of the individual claims.

## II.    Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

## III.    Analysis

### A.    Claims Against Individual Officers Under § 1983 (Counts 1 and 7)

Section 1983 is not itself a source of substantive rights, but rather a vehicle for vindicating substantive rights conferred by the Constitution or laws of the United States that have been violated by persons acting under color of state law.  *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).  Here, it is not disputed that Officers Del Valle, Manzi, and Parnell were acting under color of state law; the issue is thus

whether their actions deprived Smith of his constitutional rights. The complaint identifies both the Fourth Amendment and the Fourteenth Amendment as the source of the substantive rights allegedly infringed upon by the officers. The constitutional claim is based on the use of excessive force (Counts 1 and 7) and the officers' alleged conspiracy to hide their misconduct by filing false reports (Count 7).

### 1. Qualified Immunity Generally

The individual defendants contend that they are entitled to summary judgment on the basis of qualified immunity. The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is determined according to a two-part test. *See Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009); *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009). The relevant inquiries are (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Maldonado*, 568 F.3d at 268-69.

The question is not whether some right has been clearly established at a highly abstract level, but "whether, under the circumstances that confronted the official, 'a reasonable official would understand that what he is doing violated that right.'" *Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In other words, the question is "whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." *Burke v. Town of Walpol*e, 405 F.3d 66, 77 (1st Cir. 2005) (quoting *Limone v. Condon*, 372 F.3d

39, 44 (1st Cir. 2004)). The qualified-immunity doctrine "leaves ample room for mistaken judgments." *Berthiaume*, 142 F.3d at 15 (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). Qualified immunity is an affirmative defense, and thus the burden is on the defendants to prove that they are entitled to its protection. *DiMarco-Zappa v. Cabanillas*, 238 F.3d 25, 35 (1st Cir. 2001).

Each of the relevant claims will be analyzed under that framework.

### 2. Excessive Force

#### a. Whether a Constitutional Right Was Violated

The first inquiry is whether defendants deprived plaintiff of his Fourth Amendment rights by using excessive force during the arrest. "To establish a Fourth Amendment violation based on excessive force, a plaintiff must show that the defendant officer employed force that was unreasonable under the circumstances." *Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The objective reasonableness of the force used is determined by means of a balancing test that considers, among other things, the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.; see also Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002).

The right to make an arrest carries with it the right to use some degree of physical force. *Graham*, 490 U.S. at 396. Only excessive force is actionable; "not every push or shove rises to the level of a constitutional violation." *Gaudrealt v. Municipality of Salem*, 923 F.2d 203, 205 (1st Cir. 1990). On the other hand, "gratuitous and completely unnecessary acts of violence by

the police during a seizure violate the Fourth Amendment." *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001) (citing cases).

In the context of a motion for summary judgment, the question is whether the facts, viewed in the light most favorable to plaintiff, could lead a reasonable jury to conclude that the use of force by the officers was objectively unreasonable. Here, there are disputed issues of material fact that bear directly on the inquiry into the objective reasonableness of the use of force.

The most significant dispute is whether Smith was actively struggling and resisting arrest after his vehicle was stopped.[10] Defendants contend that after Smith was boxed in on all sides by police cruisers and pulled out of his car, he remained non-compliant. They contend that he ignored commands to show his hands; that he kept his arms tucked tightly underneath his body, kicked his legs, and swung his upper body around; and that they only used the degree of force necessary to gain control of him and effect the arrest. It is undisputed that the physical force included, at a minimum, that sufficient to cause injuries requiring transport by ambulance and radiological examination. It is also undisputed that Officer Manzi deployed her Taser four times and that Officer Del Valle did so twice.[11]

Smith contends that Officer Parnell struck him in the head with a gun and that the officers had no reason to use physical force on him after that point because he was unconscious. The

---

[10] Among other things, it is also disputed whether Smith attempted to drive his car toward Officer Parnell or Officer Padilla's cruiser before being apprehended, and whether he nearly collided with other vehicles on the highway. The resolution of those factual disputes may bear on the evaluation of the severity of the offense and whether Smith posed an immediate threat to the safety of officers or civilians.

[11] Officer Parnell denies that he struck Smith in the head with his gun. Defendants go further and claim that "[t]here is no dispute that Officer Parnell at no time used force upon the person of [Smith]." (Def. Mem. in Supp. of Mot. for Summ. J. 12). That is obviously incorrect. It is disputed whether Officer Parnell struck Smith in the head with his gun. And he admits that he participated in dragging Smith out of the car, taking him to the ground, and grabbing his right arm when he was on the ground. (Parnell Dep. 40).

video arguably supports, and certainly does not contradict, his version of events.  And the nature and degree of his injuries suggest that more force may have been applied than necessary simply to subdue and handcuff him.  Finally, additional, undocumented force may have been applied during the unexplained gap in the video recording.  Taken together, that evidence could create a reasonable inference that considerable physical force was used on an unconscious and/or unresisting suspect.  The issue, of course, is not whether such an inference is correct; rather, it is whether the officers are entitled to summary judgment.  *See, e.g.*, *Moreau v. Geraldi*, 2010 WL 4961676, at *5 (D. Mass. 2010) (denying summary judgment when plaintiff produced circumstantial evidence that defendant officer assaulted him, despite having no memory of the alleged assault, and leaving the matter for a jury to decide which account was credible).

With those disputes in mind, the Court will consider the factors set out in *Graham* as to whether the use of force was reasonable under the circumstances.

The first issue is the severity of the crime.  It is undisputed that the sole reason for the officers to begin their pursuit of Smith was that he drove his car in reverse the wrong way on a one-way street.  It is also undisputed that he subsequently refused to stop and led the officers on a high-speed chase, reaching speeds of up to 90 miles per hour on the highway, and that he later pleaded guilty to reckless driving.  There is no question that his behavior during the high-speed chase was dangerous and posed a threat to the public.[12]  However, any threat he posed had diminished considerably once he had been pulled from the vehicle.  *See Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008) (noting that the crime of driving while intoxicated, while serious, does not present the same heightened danger to arresting officers as violent crimes such as robbery or

---

[12] Defendants contend that Smith also attempted to assault two police officers with his car.  Smith disputes that characterization, and notes that although he was charged with assault with a deadly weapon, he was not convicted.  In any event, a reasonable jury could find that he did not attempt to hit officers with his car.

assault, and that this was especially true because the plaintiff had left the vehicle and no longer posed a threat of driving while intoxicated).

The second issue is whether the suspect posed an immediate threat to the safety of an officer or others. At the time that Smith first came into physical contact with the officers, his car had been completely disabled and immobilized. He was surrounded by at least nine police cruisers manned by armed police officers. No officer testified that he suspected Smith of having a gun, knife, or other weapon. No officers reported that they were injured by Smith punching, kicking, or striking them. Within a matter of seconds after the stop, Smith was lying face down on the ground underneath three to five officers, either unconscious or restrained. Again, whatever threat he posed while driving the car had dissipated substantially by the time the force was applied.[13]

The third issue is whether the suspect was actively resisting arrest or attempting to evade arrest by flight. The answer to that question turns on the resolution of the disputed facts. The parties do not dispute that Smith initially fled from the police in his car, and that it was therefore reasonable for the officers to stop his car with spike strips. The critical question is whether he resisted arrest once his car was disabled. If in fact Officer Parnell struck him on the head with a gun within seconds of the car stop, that was likely an objectively unreasonable use of force; he was not suspected of having a weapon and he was stopped and surrounded on all sides. Furthermore, there is no evidence that he was refusing to leave his car—or, indeed, that he was even given a chance to leave his car peacefully. *See, e.g.*, *Raiche v. Pietroski*, 623 F.3d 30, 37-

---

[13] Defendants rely heavily on *Kisela v. Hughes,* 138 S. Ct. 1148 (2018) and *Isom v. Town of Warren, Rhode Island*, 360 F.3d 7 (1st Cir. 2004). The facts of those cases are readily distinguishable from this case in many ways, not the least of which is the application of the second *Graham* factor: the armed suspects in *Kisela* and *Isom* posed an immediate threat to the safety of an officer or others, in contrast to Smith, an unarmed person whose car had been disabled.

38 (1st Cir. 2010) (upholding jury finding of excessive force when police slammed motorist to the ground after he was stopped and no longer evading the police); *Ciolino v. Gikas*, 861 F.3d 296, 304 (1st Cir. 2017) (upholding jury finding of excessive force when man who was yanked to the ground for disobeying police order "was not given a chance to submit peacefully to arrest before significant force was used to subdue him"). And once he was dragged out of the car, a reasonable trier of fact could find that he was no longer resisting or evading arrest, either because he had been knocked unconscious or because he was not physically struggling. *See, e.g.*, *Parker v. Gerrish*, 547 F.3d 1, 10 (1st Cir. 2008) (jury finding of excessive force upheld when defendant officer used a Taser on a suspect who was "largely compliant" but moved his wrists into a position difficult for handcuffing for several seconds); *Raiche*, 623 F.3d at 39 ("[I]t is unconstitutional to tackle a person who has already stopped . . . and who presents no indications of dangerousness."); *Jennings v. Jones*, 499 F.3d 2, 11-12 (1st Cir. 2007) (upholding jury finding of excessive force when evidence showed respondent officer increased physical pressure after plaintiff had ceased resisting for several seconds); *Jarrett v. Town of Yarmouth,* 331 F.3d 140, 147 (1st Cir. 2003) (noting that if officer had ordered dog to "bite and hold after [plaintiff] surrendered himself . . . the [plaintiff] clearly suffered a constitutional injury"); *Huckins v. McSweeney*, 2012 WL 3308395, at *3 (D.N.H. 2012) (denying summary judgment on excessive force claim where officer allegedly used a Taser on a prone person who was no longer resisting arrest); *Brown v. Lucas*, 2018 WL 2209215, at *3 (D. Mass. 2018) (denying summary judgment in excessive force case where there was a question of whether officer ordered a police dog to bite plaintiff after he had surrendered).[14]

---

[14] The Holyoke Police Department's Standard Operating Procedure on Use of Force authorizes Taser use in "drive stun" mode only when the suspect's actions constitute "active resistance." (Def. Ex. 11A).

Viewing the facts in the light most favorable to the plaintiff, and applying the *Graham* multi-factor analysis, the force employed by the officers here was objectively excessive. For present purposes, therefore, the first inquiry of the qualified-immunity framework is satisfied: defendants deprived Smith of his Fourth Amendment rights by using excessive force during the arrest.

### a.    <u>Whether the Right Was Clearly Established</u>

The next question is whether the constitutional right at issue was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009); *Maldonado v. Fontanes*, 568 F.3d 263, 268-9 (1st Cir. 2009). The "clearly established" inquiry, in turn, has two parts: "We ask (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Mlodzinski v. Lewis*, 648 F.3d 24, 32-33 (1st Cir. 2011). Although this test does not require that a pre-existing case be "directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "Precedent involving similar facts can help . . . provide an officer notice that a specific use of force is unlawful." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).

The first question is readily answered: it was clearly established law at the time of the arrest that it is unreasonable to use significant physical force upon a non-resisting, compliant person—particularly so if the person is unconscious. *See Jennings v. Jones*, 499 F.3d 2, 18 (1st Cir. 2007) (stating that "increased use of force on a previously resisting but now non-resisting arrestee" was "excessive in violation of the Constitution," and furthermore finding that this rule

was already clearly established at the time).  *See also Jarrett v. Town of Yarmouth*, 331 F.3d 140, 147 (1st Cir. 2003) (it would be a constitutional violation for defendant officer to order a police dog attack after plaintiff surrendered); *Raiche v. Pietroski*, 623 F.3d 30, 39 (finding that as of 2002, it was clearly established that it was illegal to tackle a suspect who has already stopped and presents no indications of dangerousness); *Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 61 (1st Cir. 2008) ("Based on both a 'consensus of cases of persuasive authority' . . . and the general prohibition against excessive force," defendants should have been on notice that it was constitutional violation to pepper-spray non-threatening plaintiffs, and denying qualified immunity) (internal citations omitted).[15]  The legal contours of that right were sufficiently clear as of June 25, 2014, that a reasonable officer would have understood that what he was doing violated the right.

The next question is "whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right."  *Mlodzinski*, 648 F.3d 24, 32-33 (1st Cir. 2011).  Unquestionably, a reasonable officer would have understood that striking a non-resisting person in the head with a gun, or beating the face and torso or using a Taser on such a person, violated a clearly established constitutional right to be free from excessive force.

---

[15] The First Circuit has also approved looking "to the case law of sister circuits in determining whether a right was clearly established." *McCue v. City of Bangor, Me.*, 838 F.3d 55, 64 (1st Cir. 2016).  Multiple circuit courts have held that using a Taser on a person who is not actively resisting arrest constitutes excessive force. *See Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (collecting cases and concluding that "a suspect's active resistance . . . marks the line between reasonable and unreasonable tasing in other circuits."). *See also Landis v. Baker*, 297 F. App'x 453, 464 (6th Cir. 2008) (unpublished) (officers should have known that using a Taser on a surrounded, prone suspect with one arm underneath him was a constitutional violation, and were not entitled to qualified immunity); *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 734 (4th Cir. 2013) ("It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a Taser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest," and denying summary judgment on qualified immunity grounds); *Oliver v. Fiorino*, 586 F.3d 898, 908 (11th Cir. 2009) (using a Taser more than eight times on a suspect was excessive force because he stopped resisting after the first shock, and any reasonable officer would have recognized his actions were unlawful).

Again, while there is a factual dispute about whether the officers actually took the actions plaintiff alleges, there is no real dispute that a reasonable officer would know that such actions would be unlawful.

In summary, viewing the evidence in the light most favorable to plaintiff, the officers here used objectively unreasonable and excessive force against Smith. Their actions violated the clearly established right to be free from excessive force, and a reasonable officer would have understood that those actions violated that right. Accordingly, Officers Del Valle, Manzi, and Parnell are not entitled to qualified immunity on the claim of excessive force, and summary judgment will be denied as to Count 1.

### 2. Civil Conspiracy

Count 7 alleges that defendant officers conspired to cover up their misconduct in violation of 42 U.S.C. § 1983 and Smith's constitutional rights. A civil rights conspiracy under 42 U.S.C. § 1983 is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir. 1988) (internal citations omitted). For a conspiracy to be actionable under §1983, plaintiff must prove that there was, "besides the agreement, an actual deprivation of a right secured by the Constitution and laws." *Id*. To survive a motion for summary judgment on a civil conspiracy claim, plaintiff must provide evidence, "either direct or circumstantial, of an agreement among defendants from which a reasonable jury could have inferred a conspiracy among them to inflict harm upon the plaintiff." *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008).

It is not entirely clear what federally protected right Smith alleges is at issue. *See Thore*

*v. Howe*, 466 F.3d 173, 179 (1st Cir. 2006) (upholding summary judgment for defendants on civil conspiracy claim where plaintiff only argued that defendants conspired to justify an illegal shooting, rather than identifying a specific constitutional deprivation, which—if properly constructed—would be denial of his § 1983 right of action). If it is his Fourth Amendment right to be free from excessive force, the claim must fail, as there is no evidence that the officers reached any agreement between them to use excessive force upon Smith during the run-up to his arrest. Indeed, there is no evidence in the present record that they even communicated with each other during the pursuit and before the arrest, outside of the initial dispatch from Officer Manzi to Officer Parnell requesting assistance with a car driving the wrong way down Elm Street.

Alternatively, Smith contends that defendants conspired to file false reports claiming that their use of force was reasonable. For present purpose, that will be assumed, if true, to violate a protected constitutional right. Smith identifies three facts that he says supports his conspiracy claim: first, no internal-affairs investigation was ever conducted; second, the video refutes defendants' accounts that he resisted arrest; and third, Officer Parnell neglected to describe in his arrest report the actions one can see him taking in the video—that is, approaching the car window, handing a black object to a different officer, and removing Smith from the car. The evidence in support of those assertions, however, is not sufficient to sustain a conspiracy claim.

To begin, there is no evidence in the record that the Holyoke Police Department either conducted an internal-affairs investigation or failed to conduct one. At the summary judgment stage, the issues are decided on the basis of record evidence, not allegations. And there is simply no evidence either way to support or refute Smith's contention. And the video and Officer Parnell's report, taken together, are not enough to prove a conspiracy. Certainly there are discrepancies between the video and the various officers' reports, but that alone does not suggest

that the officers reached an agreement or common plan to falsify their reports. Indeed, the discrepancies *among* the arrest reports (such as Officer Manzi failing to mention that Smith attempted to run over Officer Parnell, or Officers Manzi and Del Valle saying that Smith refused to yield both arms while Officer Parnell only mentioned his right arm) suggest that the parties did not reach such an agreement. *See Basu v. Brogan*, 47 F. App'x 586, 587-88 (1st Cir. 2002) (unpublished) ("There is no evidence that in the heat of the moment [defendants] arrived at an agreement or 'common plan' to offer false statements that would lead to Basu's arrest. The police officers arrived very shortly after the car incident and immediately interviewed the [defendants]."). Smith has not shown a pattern of behavior from defendants sufficient to establish evidence of an ongoing conspiracy to deprive him of his rights, even assuming that the officers acted with base motives in preparing their reports.

In summary, Smith has not provided sufficient evidence, "either direct or circumstantial, of an agreement among defendants from which a reasonable jury could have inferred a conspiracy among them to inflict harm upon the plaintiff." *Estate of Bennett*, 548 F.3d at 178. Summary judgment will therefore be granted in favor of defendants on the civil conspiracy claim.

### B.    Claim Against the City of Holyoke Under § 1983 (Count 2)

The City of Holyoke has moved for summary judgment on Count 2, which seeks damages against the City under a theory of municipal liability. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). Under *Monell* and its progeny, a municipality can be held liable for alleged constitutional deprivations that arise from a governmental policy or practice. In addition to establishing a constitutional deprivation, a plaintiff must show that (1) the municipality had a custom, policy, or practice of failing to investigate, discipline, supervise, or

train its officers; (2) this custom, policy, or practice was such that it demonstrated a "deliberate indifference" to the rights of those citizens with whom its officers came into contact; and (3) the custom, policy, or practice was the direct cause of the alleged constitutional violation.  *DiRico v. City of Quincy*, 404 F.3d 464, 468-69 (1st Cir. 2005) (internal quotations omitted); *see also City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989); *Monell*, 436 U.S. at 690-92.

To prove a *Monell* claim against the City for failure to train or supervise its police officers, the plaintiff must demonstrate both the existence of a policy or custom and a "direct causal link" between that policy and the alleged constitutional deprivation.  *Canton*, 489 U.S. at 385; *see also Monell*, 436 U.S. at 694 (policy must be the "moving force [behind] the constitutional violation").  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Monell*, 436 U.S. at 691 (informal practice must be "so permanent and well settled as to constitute a 'custom or usage' with the force of law"); *Whitfield v. Melendez-Rivera,* 431 F.3d 1, 13 (1st Cir. 2005) (practices that are not officially authorized may nonetheless be actionable under *Monell* if they are "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.").

Smith bases his *Monell* claim on two theories:  (1)a failure to train officers on pursuit and use of force, and (2) a failure to investigate, supervise, and discipline officers who have used excessive force.

### 1. <u>Failure to Train</u>

Smith points to four distinct instances of failure to train, and argues that together they

show that the City of Holyoke had a custom or policy of deficient training on vehicular pursuit and use of force.

First, Officer Manzi testified that on the date of the incident, she was not familiar with the police department's policy on Taser use or vehicular pursuit, and in fact she had never been trained on the pursuit policy. This is perhaps the most troubling evidence of failure to train; Officer Manzi was "brand new" to the force at the time and any lessons she had learned in her training should have been fresh in her mind. (Manzi Dep. 25).

Second, Officer Del Valle testified that he did not think it was his call to discontinue his participation in the pursuit. That belief is contradicted by the department's "High Speed Pursuit Policy" SOP, which states that each officer must use his or her discretion to join or discontinue a pursuit. (Def. Ex. 11C).

Third, at least three or four Holyoke police cruisers became directly involved in the pursuit. That also appears to violate the "High Speed Pursuit Policy" SOP, which states that "[o]nly one vehicle shall be directly involved in a high-speed chase unless a Commanding Officer otherwise orders." (Def. Ex. 11C). It also violates the "Vehicular Pursuit" SOP, which states that "[a] third, fourth, fifth, etc. Holyoke Police vehicle should not become directly involved in the pursuit." (Def. Ex. 11B).

Fourth, if credited, the officers' alleged actions in striking Smith's head with a gun, beating him, and using Tasers on his unresisting body violated the "Use of Force" SOP. The SOP authorizes Taser use only on a person who is actively resisting, and general physical force only to the extent necessary to bring an incident under control. (Def. Ex. 11A).

In addition, Smith has submitted a report by criminologist Dr. R. Paul McCauley, who identified inadequacies in the officers' method of effecting the vehicle stop. Among other

things, McCauley states that the car was surrounded with too many officers, creating a chaotic scene and a greater risk of accidental injury. (McCauley Report, Pl. Ex. 6).

The first question is whether these deficiencies suggest that the City of Holyoke had a "custom, policy, or practice" of failing to train so egregious that it gave rise to a constitutional violation. "[A] training program must be quite deficient" to give rise to a "failure to train" constitutional claim against a municipality: "the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." *Young v. City of Providence ex. Rel. Napolitano*, 404 F.3d 4, 27 (1st Cir. 2005). However, the court cannot ignore "genuine disputes of fact about whether this training ever took place." *Id.* (reversing grant of summary judgment to defendant on *Monell* "failure to train" claim, as there was a genuine dispute as to whether officers were trained at all on risks of friendly fire).

Here, the critiques offered by Dr. McCauley about the methods used to effect the stop are, at best, arguments that the police department training on high-risk pursuits and stops was imperfect; those deficiencies are insufficient, without more, to establish a failure to train that rises to a constitutional violation. More troubling is Manzi's complete lack of familiarity with the vehicular pursuit and use of force protocols, and the discrepancies between officers' actions in the pursuit and the Holyoke vehicular pursuit SOPs. Such gaps in the knowledge of the officers could raise "genuine disputes of fact about whether this training" on use of force and vehicular pursuit "ever took place." *Young*, 404 F.3d at 27. Defendants counter that Officer Parnell was knowledgeable about pursuit policies, had prior pursuit experience, and considered the appropriate factors when making his discretionary decision to continue the pursuit; they argue that this demonstrates that there was not a widespread failure to train. But there appears to be a genuine dispute of fact about whether the City broadly failed to train its officers on pursuit

25

and use of force.

The second question is whether the alleged failure to train demonstrated a "deliberate indifference" to the rights of persons with whom the officers came into contact. "Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies. . . . A plaintiff typically must show a pattern of similar constitutional violations by untrained employees . . . to demonstrate deliberate indifference for purposes of failure to train." *Gray v. Cummings*, 917 F.3d 1, 14 (1st Cir. 2019) (internal quotations and citations omitted) (affirming summary judgment for defendants in *Monell* claim, where plaintiff claimed that the respondent town's training on interacting with mentally ill people was faulty, but provided no evidence of past violations that would put the town on notice of the unconstitutional effects of this failure to train).

Smith has identified two recent lawsuits against the City of Holyoke and its police officers that alleged excessive force: *De Jesus v. City of Holyoke, et. al.*, No. 3:13-cv-30128-MAP (D. Mass.), based on the alleged beating of an unarmed and unresisting plaintiff after a vehicular pursuit in 2010; and *Hernandez-Pagan v. City of Holyoke, et. al.*, No. 3:17-cv-30031-MGM (D. Mass.), based on the alleged beating of an unarmed 12-year-old boy who was innocent of any crime but disobeyed police orders at a crime scene in February 2014. Neither of those suits identify Officers Del Valle, Manzi, or Parnell as a respondent. Both suits survived motions for summary judgment and were eventually settled and dismissed.

Those prior cases, in this context, could give rise to a finding of deliberate indifference by the City of Holyoke. High-speed vehicular pursuits are relatively rare, and certainly so when

compared to traffic stops or other citizen encounters.  They present unique dangers, and not just

to the police and public; there is a strong likelihood that they will terminate in an adrenaline-

filled, group encounter between police officers and a suspect, which in turn greatly increases the

potential for the exercise of excessive force.  A single past episode of a vehicular pursuit gone

wrong therefore may have substantial significance in the *Monell* calculus, even where that would

not be true as to other types of police misconduct.  Here, a lawsuit had been filed in 2013

alleging the use of excessive force—specifically, the beating of an unarmed and unresisting

suspect---after a vehicular pursuit.[16]  Under the circumstances, a reasonable jury could conclude

that the City was on notice as to the propensity of its officers to use excessive force after a

vehicular pursuit.  A reasonable jury could further conclude that the City was aware that its

training on vehicular pursuits and the use of force was inadequate, but nonetheless exhibited

deliberate indifference to the unconstitutional effects of those inadequacies.  *See Fiacco v. City*

*of Rensselaer, N.Y.*, 783 F.2d 330, 328 (2nd Cir. 1986) ("Whether or not the claims [of excessive

force] had validity, the very assertion of a number of such claims put the City on notice that there

was a possibility that its police officers had used excessive force" and bore upon whether the

City was deliberately indifferent to officers' excessive force).

The third question is whether the City's alleged failure to train its officers on use of force

and pursuit policy was the direct cause of the alleged constitutional violation.  Defendants argue

that any deficiencies in the City's vehicular pursuit training did not cause Smith's injuries,

because he was injured by contact with police officers rather than by the pursuit itself.  The

Court is not so sure.  Even though Smith was not injured by the car chase or by the spike strips, a

---

[16] As noted, there was also a separate case where officers were alleged to have used excessive force on an
unarmed child who had disobeyed police orders but had not acted violently.

reasonable jury could find that the officers' lack of training in the pursuit policy led to a grossly excessive number of officers being present at the end of the pursuit. A reasonable jury could further find that the excessive number of officers, at least one of whom had not been trained at all, created a chaotic, dangerous arrest scene, with officers not being able to communicate effectively and calmly with him or with each other. That, in turn, increased the likelihood that Smith would be subject to excessive force.[17]

In summary, Smith has raised a genuine dispute of fact as to whether the City of Holyoke failed to train its officers on its written use of force and vehicular pursuit policy, which may have directly caused defendant officers to violate his constitutional right to be free from excessive force. Summary judgment will therefore be denied as to Count 2, to the extent that claim relies on the City's alleged failure to train officers on vehicular pursuit and use of force.

## 2. Failure to Investigate, Supervise, and Discipline

Smith further argues that the City failed to investigate, supervise, and discipline officers who used excessive force. He has submitted a report from Dr. McCauley stating that the Holyoke Police Department's failure to conduct an internal-affairs investigation revealed an "organizational indifference to holding officers accountable . . . [which] jeopardizes the safety of both police officers and citizens." (McCauley Report 19; Pl. Ex. 6). Again, however, he has submitted no evidence that the police department actually failed to conduct an internal-affairs investigation.

The Holyoke Police Department "Use of Force" SOP requires that officers file a use of force report every time they deploy a weapon (including a Taser) or injure a person. The SOP

---

[17] The City's alleged failure to train its officers on use of force and appropriate use of a Taser, if substantiated, could also be a "direct causal link" to the excessive use of force.

includes a standard "Use of Force Report," which both plaintiff and defendants allege that Officers Del Valle and Manzi completed regarding their Taser use. There is no evidence that the Holyoke Police Department had a custom or policy of failing to complete Use of Force reports, which arguably could be evidence of broader failures to investigate excessive-force claims.[18]

In short, plaintiff has not presented affirmative evidence that the City of Holyoke had a custom or policy of failing to investigate, supervise, or discipline its officers for excessive force. Summary judgment will therefore be granted as to Count 2, to the extent that the claim relies on the City's alleged failure to investigate, supervise, or discipline its officers.

### 3. Whether to Bifurcate Claim Against the City from Claims Against Individual Officers

Defendants have moved in the alternative to bifurcate trial of the *Monell* claim against the City from the claims against the individual police officers. Fed. R. Civ. P. 42(b) permits a court to order a separate trial of one or more separate claims "for convenience, to avoid prejudice, or to expedite and economize." The decision to bifurcate a civil-rights trial into an initial phase concerning the liability of individual officers, followed by a second phase concerning municipal liability, is a "classic exercise of the trial court's management discretion." *Lund v. Henderson*, 807 F.3d 6, 12 (1st Cir. 2015).

The alternative motion for bifurcation will be denied. The Court finds that it is in the interest of judicial economy to resolve the claims against the individual officers and the claim against the City in one trial, as there is substantial overlap in the relevant evidence. Furthermore,

_____

[18] Smith points to a recent lawsuit, *Hernandez-Pagan v. City of Holyoke, et. al.*, No. 3:17-cv-30031-MGM (D. Mass.), in which plaintiff accused Holyoke officers of ignoring her excessive-force complaint and refusing to investigate the beating of her 12-year-old son. Smith argues that this demonstrates Holyoke's "custom or policy" of failing to investigate and discipline officers. However, that case was not adjudicated on the merits, and even assuming its allegations were true, it represents a single instance of improper follow-up to an excessive-force complaint.

there has been no showing that any party would be prejudiced by trying all claims together, particularly in light of the narrowed scope of the *Monell* claim. The Court is confident that with proper jury instructions and careful trial management any possible prejudice or juror confusion will be avoided.

**IV.**     **Conclusion**

For the foregoing reasons, defendants' motion for summary judgment is DENIED as to the claim of excessive force under 42 U.S.C. § 1983 (Count 1); GRANTED as to the claim of civil conspiracy under 42 U.S.C. § 1983 (Count 7); DENIED as to the municipal liability claim against the City of Holyoke for failure to train (Count 2); and GRANTED as to the municipal liability claim against the City of Holyoke for failure to investigate, supervise, or discipline (Count 2). Defendants' alternative motion to bifurcate the claims against the individual defendants from the claim against the City of Holyoke is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor, IV
F. Dennis Saylor, IV
Dated: March 30, 2020                                         Chief Judge, United States District Court